(No. 103937.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. MICHAEL GLASPER, Appellant.

*Opinion filed June 18, 2009.—Rehearing denied September 28, 2009.*

174

176

Michael J. Pelletier, State Appellate Defender, Patricia Unsinn, Deputy Defender, and Elizabeth A. Botti and Barbara C. Kamm, Assistant Appellate Defenders, of the Office of the State Appellate Defender, of Chicago, for appellant.

Lisa Madigan, Attorney General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (James E. Fitzgerald and Peter D. Fischer, Assistant State's Attorneys, of counsel), for the People.

CHIEF JUSTICE FITZGERALD delivered the judgment of the court, with opinion.

Justices Thomas, Kilbride, Garman, and Karmeier concurred in the judgment and opinion.

Justice Burke dissented, with opinion, joined by Justice Freeman.

## OPINION

Following a jury trial in the circuit court of Cook County, defendant, Michael Glasper, was convicted of first degree murder and attempted first degree murder and was sentenced to consecutive prison terms of 80 and 30 years, respectively. On appeal, defendant raised several claims of error, and the appellate court affirmed his conviction. No. 1—04—3005 (unpublished order under Supreme Court Rule 23). Defendant sought leave to appeal to this court, asserting that the trial court committed reversible error when it failed to ask venire members whether they would be biased against defendant if he did not testify, in violation of Supreme Court Rule 431(b) (177 Ill. 2d R. 431(b)) and this court's holding in *People v. Zehr*, 103 Ill. 2d 472 (1984). Defendant also claimed that he was deprived of his right to a fair trial when the State engaged in prosecutorial misconduct dur-

ing closing argument. We granted defendant's petition for leave to appeal (210 Ill. 2d R. 315(a)) and now affirm the judgment of the appellate court.

## BACKGROUND

In August 2001, Eugene Banks sold drugs on the corner of Iowa and Lamon streets in Chicago. Donnell Simmons attempted to take over the drug trade on that corner by ordering Banks to stop selling and threatening him with a gun. Brian and Sammie Simmons worked for Donnell and were selling drugs on that corner during the late evening hours of August 11, 2001, when a group of men opened fire on them. Brian was shot twice and he died from his wounds. There is no evidence that Sammie was harmed. Defendant was charged with murder and attempted murder after he admitted, in a videotaped confession, that he and Banks, along with Marcus Williams, Jamal Phillips, and Tremaine Kimbrough, shot at Brian and Sammie.

At trial, Dr. Mitra Kalelkar, a Cook County medical examiner, testified that she performed an autopsy on the body of Brian Simmons. Brian was shot in the head and the bullet was recovered at the base of his brain. Brian was also shot in the right buttock. There were abrasions on Brian's face consistent with falling face-first after being shot from behind.

Michael Farris testified that he was standing near the corner of Iowa and Lamon with two women and their children at 11 p.m. on the date of the shooting. He saw defendant and two other men, whom he identified as Williams and Phillips, come out into the street. Farris explained that he has known defendant since "childhood." At the time of the shooting, Farris had known Williams and Phillips for about two years. The men were all wearing sweatshirts with the hoods up over their heads, and each was carrying a gun. Farris noticed that

Brian and Sammie were also on the street, near the corner by the alley, and they did not have weapons. Someone on the street yelled "L.A.," meaning "police," and defendant, Williams, and Phillips ran through a yard. They soon emerged in the alley where Brian and Sammie were standing. Farris testified that he saw Williams and Phillips running toward Brian and Sammie while shooting, but he did not see defendant. He admitted that he previously signed a handwritten statement and gave testimony before a grand jury indicating that he saw defendant shooting with Williams and Phillips. Farris also admitted that he has been convicted of several drug offenses, is a gang member, and did not give police information about the instant crime until he was arrested for criminal drug conspiracy occurring in the area of Iowa and Lamon two months after the shooting in question.

Keith Price testified that he has known defendant since grammar school. Approximately two weeks after the shooting, defendant told Price that he, Williams, and Phillips "got at" Brian, and "after they made sure he [Brian] was down, they helped Lou[1] [Banks] get at Sam." Defendant further explained that Banks fainted after the shooting and defendant tried to help him, but could not get him up. Defendant also told Price that he left behind a hooded sweatshirt and a gun while he was trying to help Banks. Price admitted that he did not give this information to police until two months after the shooting when he was arrested for criminal drug conspiracy related to drug sales at Iowa and Lamon. Price further stated that he was given consideration by the State in the conspiracy case in exchange for his testimony. Price pled guilty to the conspiracy charge and received

---

[1]Banks is referred to throughout the testimony by the nicknames "Lou" or "Boo."

TASC probation. Price admitted that he was a "drug addict" in 2001 when he gave police information about the instant case. Price also admitted that he had previously spent time in the penitentiary.

Officer Gerald Ostafin, a forensic investigator, testified that he was called to the murder scene to collect evidence. He found 15 to 17 cartridge casings around the area of the murder, a fired bullet near the victim's leg, and some bullet fragments. In addition, a semiautomatic weapon commonly known as a Tech 9 was recovered just around the corner from the murder scene, on Walton Street. The weapon was found on the sidewalk and a magazine containing 10 rounds of live ammunition was found a couple of feet away, on the grass. Officer Ostafin testified that while processing the scene, he spoke with Officer Aikens, who showed him a nine-millimeter handgun wrapped in a black hooded sweatshirt. Officer Ostafin attempted to get fingerprints from the gun, but was unsuccessful.

Officer Daniel Conway testified that on August 11, 2001, he heard a radio message indicating that shots were fired and a foot chase was in progress near the area of Iowa and Lamon. Officer Conway went to that location and saw Banks in police custody. After speaking to other officers, he retraced the route of the foot chase and found a blue-steel Tech 9 on Walton Street with the magazine belonging to the weapon nearby.

Officer Jimmy Akins testified that he and his partner responded to a call of shots fired in the area of Lamon and Iowa. He spoke to a person on the street and then went to a specific address on Walton Street. He found a black hooded sweatshirt in the gangway at that location. Officer Akins inspected the sweatshirt and found a chrome, nine-millimeter handgun containing seven live rounds of ammunition wrapped inside. He ejected the magazine from the gun, wrapped it back in the sweat-

shirt and then took the items to a well-lit area near other officers, about 100 feet away. Officer Akins explained that he did not call for evidence technicians or attempt to secure the area because it was dark in the gangway, unknown people were nearby, and he did not feel safe. On cross-examination, Officer Akins was asked whether he was equipped with a bulletproof vest, gun, and radio when he recovered the gun in the gangway, and he stated that he was.

The parties stipulated that Officer Gallagly would testify that he participated in the foot chase and saw Williams drop a handgun. Officer Gallagly recovered the weapon, which was a loaded, nine-millimeter, semiautomatic pistol with nine live rounds of ammunition.

Detective James Gilger testified that he was assigned to investigate the instant crime on August 11, 2001. Detective Gilger spoke to Banks, who had been taken into custody, and Sammie, who had come to the police station for questioning. Eventually, Detective Gilger started looking for defendant, Phillips, and Williams. One month later, on September 12, 2001, Detective Gilger learned that defendant had been taken into custody. Detective Gilger explained that there was a manpower shortage in the police department that day, because it was the day after the September 11, 2001, attacks, and he was working alone, uncharacteristically dressed in uniform. Detective Gilger spoke to defendant at 1:10 p.m. and read him his *Miranda* rights. Defendant denied involvement in the murder, but stated that he was aware that Banks had been taken into custody for the crime. A short while later, Detective Gilger confronted defendant with certain information and "suggested that he [defendant] tell the truth at that point." Defendant gave an oral statement implicating himself in the crime. Detective Gilger pointed out that defendant's statement shed

new light on his investigation because defendant implicated Kimbrough in the offense.

Assistant State's Attorney Kim Ward testified that she spoke to defendant after he gave his oral statement to Detective Gilger. In the course of their conversation, defendant agreed to give a videotaped statement. The video was played for the jury. In the video, defendant explained that Banks sold drugs on Iowa and Lamon. On August 11, 2001, defendant, Williams, Phillips, and Kimbrough met up with Banks and learned that he was angry because Donnell threatened him with a gun and told him that he wanted to take over drug sales on Iowa and Lamon. Defendant stated that Banks wanted to kill Donnell and Sammie, so the group drove around in Kimbrough's truck looking for them. They eventually found Donnell, but did not approach him. Defendant explained that he went into a store, and when he came out, he saw that the rest of the group had put on black hooded sweatshirts. There were five nine-millimeter guns in the truck. Sometime later, they saw Sammie talking to Brian on the corner of Iowa and Lamon. On Banks' directive, defendant, Phillips, Williams, and Kimbrough each grabbed a gun, ran down a gangway, and started shooting. Defendant stated that he saw Brian lying on the street and ran. He dropped his sweatshirt and gun somewhere on Walton Street. Defendant was shown a photograph of the gun recovered in the gangway on Walton, and he identified it as the gun he used that evening.

Kris Rastrelli, a forensic scientist specializing in firearms and tool-mark identification, testified that she examined three guns recovered by police in relation to this crime. She concluded that the gun used by defendant fired the bullet recovered from Brian's brain. Rastrelli testified that she was asked to review the evidence in this case in "kind of a rush situation" because the police

had a person in custody and they needed the results of her examination to determine whether he could be charged. Rastrelli explained that she spoke to a sergeant and a detective on October 9, 2001, about her examination of the evidence in this case, and both urged her to complete her examination before the close of business on that day. Rastrelli stated, however, that "rush" requests were not unusual, and the "rush" status of the examination did not affect her ultimate scientific opinion.

Defendant did not present any witnesses and did not testify.

The jury convicted defendant of first degree murder and attempted first degree murder. He was sentenced to a total of 110 years' imprisonment. Defendant's conviction and sentence were affirmed on appeal. No. 1—04—3005 (unpublished order under Supreme Court Rule 23). The appellate court found that the trial court committed a *Zehr* violation when it failed to ask venire members if they would harbor a bias against defendant if he chose not to testify. However, the appellate court concluded that the *Zehr* error was harmless beyond a reasonable doubt in light of the overwhelming evidence of defendant's guilt. Further, in considering defendant's claim that the State made prejudicial remarks during rebuttal argument, the appellate court concluded that the statements in question were invited by defense counsel's argument and were reasonable inferences from the evidence. Defendant now appeals.

## ANALYSIS

Defendant first contends that the trial court committed reversible error, not subject to harmless-error analysis, when it failed to conduct the *voir dire* in accordance with *Zehr* and Rule 431(b). The State concedes that the trial court committed error, but maintains that the appellate court correctly concluded that the error

was harmless beyond a reasonable doubt. We agree with the State's contention.

In *Zehr*, the defendant tendered three questions to the court for presentation to the venire:

" '1. If at the close of all the evidence and after you have heard arguments of counsel you believe that the State has failed to sustain the burden of proof and has failed to prove the defendant guilty beyond a reasonable doubt, would you have any hesitation whatsoever in returning a verdict of Not Guilty?

2. If the defendant, Mr. Zehr, decides not to testify in his own behalf, would you hold it against him?

3. Do you understand that the defendant is presumed innocent and does not have to offer any evidence in his own behalf, but must be proven guilty beyond a reasonable doubt by the State?' " *Zehr*, 103 Ill. 2d at 476.

The trial court declined to ask the questions, concluding that they pertained to matters of law and instructions. At trial, the defendant chose not to testify. The jury found him guilty of the offenses charged. The appellate court reversed the defendant's convictions, finding that the trial court abused its discretion in failing to ask the proposed questions to the venire. *People v. Zehr*, 110 Ill. App. 3d 458, 461 (1982).

We affirmed the appellate court's judgment, holding:

"[E]ssential to the qualification of jurors in a criminal case is that they know that a defendant is presumed innocent, that he is not required to offer any evidence in his own behalf, that he must be proved guilty beyond a reasonable doubt, and that his failure to testify in his own behalf cannot be held against him. If a juror has a prejudice against any of these basic guarantees, an instruction given at the end of the trial will have little curative effect. *** We agree with the appellate court that '[e]ach of these questions goes to the heart of a particular bias or prejudice which would deprive defendant of his right to a fair and impartial jury' (110 Ill. App. 3d 458, 461), and although they need not have been asked in precisely the form

submitted, the subject matter of the questions should have been covered in the course of interrogation on *voir dire*. The refusal to ask the questions resulted in prejudicial error which required reversal of the judgment." *Zehr*, 103 Ill. 2d at 477-78.

In 1997, the Supreme Court Rules Committee recommended a proposed rule to this court that sought to memorialize the *Zehr* holding by requiring trial judges to ask each of the *Zehr* questions to the venire. See Illinois Supreme Court Rules Committee, Recommendations to the Supreme Court of Illinois (March 1997). This court modified the proposal so that *Zehr* questioning was only required upon request. See Illinois Supreme Court Rules Committee, Recommendations to the Supreme Court of Illinois (March 1997); see also M. Toomin, *Jury Selection in Criminal Cases: Illinois Supreme Court Rule 431-A Journey Back to the Future and What it Portends*, 48 DePaul L. Rev. 83, 93 (1998).

The version of the Rule adopted by this court in 1997 provided:

"If requested by the defendant, the court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.

The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." 177 Ill. 2d R. 431(b).[2]

---

[2]Rule 431(b) was recently amended by this court. It now provides, in relevant part: "The court shall ask each potential

We apply this rule to the instant case. The facts demonstrate that prior to *voir dire*, defense counsel stated: "And, your Honor, also asking the Defendant doesn't have to testify." The trial court responded: "I don't ask them about that. I tell them. I give them the law thing and I don't want any questions about it." The parties did not discuss the issue further.

The trial judge subsequently addressed the venire as a group, and stated:

"It is absolutely essential as we select this jury that each of you understand and embrace these fundamental principles; that is, all persons charged with a crime are presumed innocent and that it is the burden of the State who has brought the charges to prove the Defendant guilty beyond a reasonable doubt.

What this means is that the Defendant has no obligation to testify in his own behalf or to call any witnesses in his own defense. He may simply sit here and rely upon what he and his lawyers perceive to be the inability of the State to present sufficient evidence to meet their burden of proof. Should that happen, you will decide the case on the basis of the evidence presented by the Prosecution. The fact that the Defendant does not testify must not be considered by you in any way in arriving at your verdict. However, should the Defendant elect to testify, or should his lawyers present witnesses in his behalf, then you are to consider that evidence in the same manner and by the same standards as the evidence presented by the State's Attorneys. The bottom line, however, is that there is no burden upon the Defendant to prove his innocence. It's the State's burden to prove him guilty beyond a reasonable doubt."

---

juror, individually or in a group, whether that juror understands and accepts the following principles: *** (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects." Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431(b), eff. May 1, 2007.

The judge then went on to question each venire member individually, but he did not ask them if defendant's decision not to testify would influence their verdict.

The record makes clear that defense counsel requested Rule 431(b)(4) questioning prior to the commencement of this trial. The trial court's refusal to ask the question was a clear violation of Rule 431(b)(4) and this court's mandate in *Zehr*. We reiterate that, under the rule applicable at the time, once a defendant makes the request, the decision to question the venire in accordance with Rule 431(b) is not discretionary—it is a requirement. We likewise reiterate that the rules of this court are not mere suggestions. They have the force of law, and they should be followed. *Bright v. Dicke*, 166 Ill. 2d 204, 210 (1995). The trial court committed error when it ignored our long-standing precedent and our rules by refusing to question the venire in accordance with Rule 431(b)(4).

The trial court's failure to comply with Rule 431(b)(4) in the instant case presents us with an issue of first impression. We are called upon to determine whether the trial court's error requires us to presume prejudice and automatically reverse defendant's conviction, or whether the error is subject to harmless-error analysis. Defendant maintains that the trial court's failure to question the venire in accordance with Rule 431(b)(4) deprived him of his sixth amendment right to a fair trial before an impartial jury, and prejudice must be presumed because it would be impossible for a reviewing court to assess the prejudicial impact of the error. Defendant points to this court's decision in *Zehr*, as well as its conclusions in *People v. Strain*, 194 Ill. 2d 467 (2000), *People v. Daniels*, 172 Ill. 2d 154 (1996), and *People v. Smith*, 233 Ill. 2d 1 (2009), in support of his position. The State counters that reversal is not required in this case because the evidence against defendant is overwhelming, thus render-

ing the trial court's error harmless beyond a reasonable doubt. Moreover, the State argues that if this court were to presume prejudice and reverse defendant's conviction, it would be creating a new category of structural error not recognized by the United States Supreme Court.

As previously stated, in *Zehr*, this court held that the trial court's refusal to question the venire as the defendant requested resulted in "prejudicial error which required reversal of the judgment." *Zehr*, 103 Ill. 2d at 477-78. Defendant argues, in light of this statement, that *Zehr* precludes harmless-error review and requires automatic reversal. We note at the outset that there is no indication that the *Zehr* court contemplated, or was even asked to contemplate, whether harmless error could apply. In fact, at defendant's behest, we have reviewed the briefs filed in *Zehr* and take judicial notice that the issue was not presented to the court.

Defendant asserts that this court's decisions in other, analogous cases, also support reversal of his conviction. Defendant calls our attention to *Daniels* and *Strain*, where the defendants asserted, as defendant does here, that their sixth amendment right to a fair trial was violated because they were denied the opportunity to ensure that they were tried before an impartial jury. Defendant points out that this court did not apply a harmless-error analysis in either of those cases, and contends that we should, therefore, refrain from applying harmless error in the instant case.

In *Daniels*, the defendant asserted that he was denied a fair trial because he was permitted only 7 peremptory challenges instead of the 14 challenges required in a capital case by Supreme Court Rule 434(d) (134 Ill. 2d R. 434(d)). *Daniels*, 172 Ill. 2d at 158. We looked to the Supreme Court's decision in *Swain v. Alabama*, 380 U.S. 202, 219, 13 L. Ed. 2d 759, 772, 85 S. Ct. 824, 835 (1965), where the Court stated that the denial of the right to

peremptory challenges was presumptively prejudicial and amounted to reversible error, and our decision in *People v. Moss*, 108 Ill. 2d 270 (1985), which followed *Swain*. We concluded that prejudice could be presumed upon the denial of peremptory challenges "when the requisite showing of denial or impairment is established under the authority of *Swain* and *Moss*." *Daniels*, 172 Ill. 2d at 165. However, we declined to adopt a *per se* rule that reversible error occurs whenever the number of peremptory challenges "available to the defendant by our rule" was reduced in a capital case. *Daniels*, 172 Ill. 2d at 165. Instead, we instructed that each case should be judged by its own specific facts. *Daniels*, 172 Ill. 2d at 165. Moreover, we did not consider whether review for harmless error would be appropriate where Rule 434(d) was violated, and there is no indication in *Daniels* that harmless error was raised by the State.

In *Strain*, we concluded that the defendant was denied his right to a fair trial when the trial court refused to pose two questions to the venire probing for gang bias. We held that defendants must be given an opportunity to question prospective jurors about gang bias when testimony related to gang activity is to be an integral part of the defendant's trial. *Strain*, 194 Ill. 2d at 477. We did not, however, state that the failure to probe for gang bias required automatic reversal. Moreover, we did not perform a harmless-error analysis, and there is no indication that harmless error was raised in the case.

Although we reversed the defendants' convictions and remanded for new trials in both *Daniels* and *Strain* without conducting harmless-error analyses, those cases do not direct the same outcome here. Harmless error was simply not at issue in either case.

Defendant next points to this court's decision in *People v. Smith*, 233 Ill. 2d 1 (2009), where the application of the harmless-error doctrine was considered and

rejected. In *Smith*, the defendants were charged in multicount indictments with intentional, knowing, and felony murder. Defendants requested that their juries be provided with separate verdict forms because the juries' specific findings could result in different sentencing consequences. The trial court denied the requests and the juries were given general verdict forms. *Smith*, 233 Ill. 2d at 13. We found that the trial court erred in denying defendant's requests for specific verdict forms. *Smith*, 233 Ill. 2d at 23. We also rejected the State's assertion that the error was harmless in light of the overwhelming evidence against the defendants, because reviewing for harmless error would require us to improperly invade the province of the jury, and substitute our evaluation of the evidence for their findings of fact. *Smith*, 233 Ill. 2d at 25.

*Smith* is not comparable to the case at bar. In *Smith*, we declined to conduct harmless-error review of an error that involved a basic, fundamental protection provided by the sixth amendment of the federal constitution—the right to have a jury, rather than a judge, determine an accused's guilt. *Smith*, 233 Ill. 2d at 25-26. The United States Supreme Court has stated that harmless-error review under such circumstances is improper, first, because there is no actual jury verdict to review for harmless error (*Sullivan v. Louisiana*, 508 U.S. 275, 280, 124 L. Ed. 2d 182, 189-90, 113 S. Ct. 2078, 2082 (1993) ("[t]here being no jury verdict of guilty-beyond-a-reasonable-doubt, the question whether the same verdict *** would have been rendered absent the constitutional error is utterly meaningless" (emphasis omitted))), and second, because the deprivation of the right to a jury verdict qualifies as a "structural error" (*Sullivan*, 508 U.S. at 281-82, 124 L. Ed. 2d at 191, 113 S. Ct. at 2083 ("[t]he deprivation of that right, [right to trial by jury,] with consequences that are necessarily unquantifiable

and indeterminate, unquestionably qualifies as 'structural error' ")). The error in this case does not involve a fundamental right, or even a constitutional protection. The error involves a right made available only by rule of this court. Significantly, the right in question, at the time of the instant trial, was not afforded to all defendants—only those defendants who chose to exercise it.

The violation of a supreme court rule does not mandate reversal in every case (see *People v. Houston*, 226 Ill. 2d 135, 152 (2007) (violation of rule requiring court reporter does not constitute *per se* ineffective assistance of counsel); *Daniels*, 172 Ill. 2d at 165 (expressing reluctance to hold that *per se* reversal of a conviction is required for a violation of right conferred only by supreme court rule)), and this court has applied the harmless-error doctrine to errors stemming from the violation of our rules. See *People v. Rivera*, 227 Ill. 2d 1 (2007) (*Rivera II*) (violation of right to seven peremptory challenges subject to harmless-error review); *People v. Pasch*, 152 Ill. 2d 133, 193 (1992) (violation of a discovery rule does not require automatic reversal). Recently, in *Rivera II*, we considered whether harmless-error review was appropriate where the defendant alleged that his sixth amendment right to a fair trial was violated when he was denied one of the seven peremptory challenges afforded to him pursuant to Supreme Court Rule 434(d). In that case, the trial judge, *sua sponte*, raised a reverse-*Batson* challenge against the defendant when he used a peremptory challenge to excuse an African-American female from the jury.[3] We determined that the record

---

[3]In *People v. Rivera*, 221 Ill. 2d 481, 515 (2006) (*Rivera I*), we concluded that a trial court did have the authority to *sua sponte* raise a *Batson* challenge, but the court was only permitted to do so where "a *prima facie* case of discrimination is abundantly clear." We remanded the matter for a hearing to determine whether a

failed to support a *prima facie* case of discrimination, and concluded that the trial court erred in denying defendant's peremptory challenge. *Rivera II*, 227 Ill. 2d at 14. However, we found that the trial court's error was harmless in light of the overwhelming evidence against the defendant. *Rivera II*, 227 Ill. 2d at 26. The defendant challenged this holding, and filed a petition for a writ of *certiorari* in the United States Supreme Court which was granted. The Supreme Court affirmed our judgment and found no error in applying the harmless-error doctrine where the accused has been denied his state law right to a peremptory challenge. *Rivera v. Illinois*, 556 U.S. 148, 173 L. Ed. 2d 320, 129 S. Ct. 1446 (2009).

The core issue presented to this court in *Rivera II* is the same as that presented here: whether the trial court's error, based on a violation of supreme court rule, denied the defendant his constitutional right to a fair and impartial jury such that the error was presumptively prejudicial and required automatic reversal. The State's response is also the same: any error made by the trial court would be subject to harmless-error analysis and does not warrant automatic reversal. In *Rivera II*, we agreed with the State, and we reach the same conclusion in this case.

Our analysis in *Rivera II* relied upon the Supreme Court's opinion in *United States v. Martinez-Salazar*, 528 U.S. 304, 145 L. Ed. 2d 792, 120 S. Ct. 774 (2000). In *Martinez-Salazar*, the Supreme Court held that a defendant is not deprived of any constitutional or rule-based right to peremptory challenges when the defendant uses a peremptory challenge to strike a potential juror who should have been excused for cause. *Martinez-*

---

*prima facie* case of discrimination existed. After the hearing, the matter returned to this court for further consideration. See *Rivera II*, 227 Ill. 2d 1.

*Salazar*, 528 U.S. at 307, 145 L. Ed. 2d at 798, 120 S. Ct. at 777. In reaching this conclusion, the Court recognized that the United States Constitution does not confer a right to peremptory challenges, and the denial of the use of a peremptory challenge does not jeopardize a defendant's sixth amendment right to an impartial jury. *Martinez-Salazar*, 528 U.S. at 311, 145 L. Ed. 2d at 800, 120 S. Ct. at 779. The Court made clear that the use of peremptory challenges is only one way to ensure that a jury is unbiased, and that denial of the use of a peremptory challenge does not, automatically, render a trial unfair, as other mechanisms are in place to ensure the fairness of a jury. *Martinez-Salazar*, 528 U.S. at 311, 145 L. Ed. 2d at 800, 120 S. Ct. at 779.

The Court acknowledged that its position could be interpreted to conflict with *Swain*, 380 U.S. at 219, 13 L. Ed. 2d at 772, 85 S. Ct. at 835, where the Court stated that automatic reversal was required where a defendant was denied the use of a peremptory challenge. However, the Court reasoned that the automatic-reversal rule should no longer be followed because it arose from nonbinding *dictum* rendered obsolete by the adoption of harmless-error review. *Martinez-Salazar*, 528 U.S. at 317 n.4, 145 L. Ed. 2d at 804 n.4, 120 S. Ct. at 782 n.4. Following *Martinez-Salazar*, we concluded in *Rivera II* that automatic reversal was not necessitated by the trial court's error in denying one of defendant's peremptory challenges. *Rivera II*, 227 Ill. 2d at 18-19.

In affirming our judgment, the Supreme Court approved of our analyses of *Martinez-Salazar* and *Swain*, and upheld this court's view that the denial of a peremptory challenge does not rise to the level of a structural error requiring reversal in every instance. *Rivera*, 556 U.S. at 161, 173 L. Ed. 2d at 331, 129 S. Ct. at 1455. The Supreme Court repeatedly noted that the right to peremptory challenges is a "state-provided" right.

*Rivera*, 556 U.S. at 160, 173 L. Ed. 2d at 330, 129 S. Ct. at 1455. Additionally, the court emphasized that errors of state law do not automatically rise to the level of a federal constitutional violation requiring automatic reversal. *Rivera*, 556 U.S. at 160-61, 173 L. Ed. 2d at 331, 129 S. Ct. at 1455. The Supreme Court stated:

"Rivera insists that *** the deprivation of a state-provided peremptory challenge requires reversal as a matter of federal law. We disagree. *** As our recent decisions make clear, we typically designate an error as 'structural,' therefore 'requir[ing] automatic reversal,' only when 'the error "necessarily render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." ' [Citation.] The mistaken denial of a state-provided peremptory challenge does not, at least in the circumstances we confront here, constitute an error of that character." *Rivera*, 556 U.S. at 160-61, 173 L. Ed. 2d at 330-31, 129 S. Ct. at 1455.

Like the defendant in *Rivera II*, defendant here claims that his sixth amendment right to a fair and impartial jury was violated when the trial court refused to question the venire in accordance with Rule 431(b)(4) and our holding in *Zehr*. *Rivera II* intimates, however, that defendant's constitutional rights were not compromised by the trial court's Rule 431(b)(4) violation. Defendants do not have a right to Rule 431(b)(4) questioning under either the United States or the Illinois Constitution. A defendant's "right" to such questioning in Illinois courts is the product of this court's inherent power to make rules regulating the conduct of the circuit courts. See *Strain*, 194 Ill. 2d at 475. While the rule is designed to help ensure that defendants are tried before a fair jury, we cannot say that Rule 431(b)(4) questioning is indispensable to a fair trial. This point is inherent in the rule itself, which originally required the questioning only if the defendant requested it. It would be inconsistent to conclude that the failure to question the venire in

compliance with Rule 431(b)(4) ensures that biased jurors will be impaneled when a defendant can choose to forgo such questioning, apparently without such concerns.

We recognize that the language in *Zehr* can be construed to suggest that automatic reversal is required where Rule 431(b)(4) questioning is not conducted. Requiring *per se* reversal for a Rule 431(b)(4) violation, however, would be contrary to principles espoused by this court in other, analogous cases decided after *Zehr*. In *People v. Emerson*, 122 Ill. 2d 411 (1987), the defendant requested that the trial court ask prospective jurors whether they understood the presumption of innocence and whether they objected to that principle. The trial court declined, reasoning that it had sufficiently covered the topic in earlier remarks made to the entire venire. *Emerson*, 122 Ill. 2d at 425. Prior to individual questioning, the trial judge asked the venire if they would be able to follow the law as instructed, and explained the presumption of innocence. *Emerson*, 122 Ill. 2d at 426. This court held that "the purpose expressed in *Zehr* was satisfied here by the trial judge's general admonition coupled with his subsequent discussion of the presumption of innocence." *Emerson*, 122 Ill. 2d at 427. The *Emerson* court moved away from the portion of the *Zehr* holding which stated that the relevant questions should be covered "in the course of interrogation on *voir dire*," and that the failure to ask these questions amounts to "prejudicial error." *Zehr*, 103 Ill. 2d at 477-78.

More recently, in *Daniels*, we expressed a reluctance to hold that automatic reversal was required for a violation of a "right" conferred upon defendants by rule of this court. *Daniels*, 172 Ill. 2d at 165. This reluctance makes sense when we consider that automatic reversal is only required where an error is deemed "structural," *i.e.*, a systemic error which serves to "erode the integrity of the judicial process and undermine the fairness of the

defendant's trial." *People v. Herron*, 215 Ill. 2d 167, 186 (2005); *Rivera II*, 227 Ill. 2d at 19-20. The Supreme Court has recognized errors as " 'structural' and thus subject to automatic reversal, only in a 'very limited class of cases.' " *Neder v. United States*, 527 U.S. 1, 8, 144 L. Ed. 2d 35, 46, 119 S. Ct. 1827, 1833 (1999), quoting *Johnson v. United States*, 520 U.S. 461, 468-69, 137 L. Ed. 2d 718, 728, 117 S. Ct. 1544, 1549-50 (1997). The error alleged herein is not included in this class.

Indeed, automatic reversal is not even required in cases where the prosecution makes an erroneous reference to a defendant's decision to exercise his constitutional right to remain silent in violation of *Doyle v. Ohio*, 426 U.S. 610, 619, 49 L. Ed. 2d 91, 98, 96 S. Ct. 2240, 2245 (1976), where the Supreme Court held that the prosecution's use of a defendant's post-*Miranda* silence for impeachment purposes is generally a due process violation. It would be inconsistent for this court to hold that a trial court's failure to question a venire regarding a defendant's decision not to testify in violation of Rule 431(b)(4) requires automatic reversal, when we have repeatedly held that automatic reversal is not required when a prosecutor mentions a defendant's post-*Miranda* silence and commits a *Doyle* violation. See *People v. Dameron*, 196 Ill. 2d 156, 164-66 (2001) (citing cases where this court concluded that a *Doyle* violation amounted to harmless error). Our precedent with respect to *Doyle* violations is significant to our instant analysis when we consider that Rule 431(b)(4) has its roots in the constitutional privilege against self-incrimination. *Zehr*, 103 Ill. 2d at 477 (stating that it is "essential" that jurors understand that a defendant's silence cannot be held against him).

We note, also, that questioning similar to that set forth in our Rule 431(b)(4) is not uniformly required in other state and federal jurisdictions. See *Baker v. State*,

157 Md. App. 600, 617, 853 A.2d 796, 806 (2004), citing *State v. Dahlgren*, 200 Conn. 586, 602-03, 512 A.2d 906, 914-15 (1986); *United States v. Aloi*, 9 F.3d 438 (6th Cir. 1993); *United States v. Urian*, 858 F.2d 124 (3d Cir. 1988); *United States v. Goodwin*, 470 F.2d 893 (5th Cir. 1972) (all holding that the trial court is not required to ask potential jurors whether they would draw an adverse inference from a defendant's election not to testify); see also *State v. Johnson*, 62 S.W.3d 61, 65 (Mo. App. 2001) (finding that even if the trial court erred in excluding the *voir dire* question regarding an adverse inference due to defendant's decision not to testify, "the record does not support a finding of a real probability of prejudice therefrom sufficient to find reversible error"); but see *Hayes v. Commonwealth*, 175 S.W.3d 574 (Ky. 2005) (holding that it is *per se* reversible error to prohibit adverse inference questioning of the venire); see also *State v. Clement*, 2 S.W.3d 156 (Mo. App. 1999); *Jones v. State*, 378 So. 2d 797 (Fla. App. 1980); *State v. Hayes*, 364 So. 2d 923 (La. 1978) (holding that a defendant has a right to question the venire about their willingness to accept the defendant's right not to testify). Moreover, as pointed out by the dissenting justices in *Hayes*, courts in other jurisdictions that do require questioning similar to our Rule 431(b)(4) generally do not find that the failure to conduct this questioning amounts to *per se* reversible error. *Hayes*, 175 S.W.3d at 599 (Roach, J., dissenting, joined by Graves and Wintersheimer, JJ.) ("[a]side from the opinion of the majority, I am unable to find a case in America that would refuse to apply harmless error in these circumstances").

We conclude that the trial court's error in this case does not rise to the level of structural error. We recognize that we are free to determine that the failure to question the venire in accordance with *Zehr* and Rule 431(b)(4) is an error so severe that reversal is required, regardless of

whether the error would be deemed structural under federal law. As the Supreme Court stated in *Rivera v. Illinois*, 556 U.S. at 162, 173 L. Ed. 2d at 331, 129 S. Ct. at 1456, "States are free to decide, as a matter of state law, that a trial court's mistaken denial of a peremptory challenge is reversible error *per se*. Or they may conclude, as the Supreme Court of Illinois implicitly did here, that the improper seating of a competent and unbiased juror does not convert the jury into an ultra vires tribunal; therefor, the error could rank as harmless under state law." However, we decline to find that a violation of Rule 431(b) is *per se* reversible in light of the language and history of the rule. As previously stated, when crafting the version of Rule 431(b) applicable here, this court had the opportunity to mandate *Zehr* questioning in every case, but chose not to. Instead, this court made the right to *Zehr* questioning permissive. The court intentionally structured Rule 431(b) so that the trial court's default position was to refrain from *Zehr* questioning. We conclude that a violation of Rule 431(b), as applied in this case, does not require automatic reversal and is amenable to harmless error review.

We emphasize that this holding is limited to the version of Rule 431(b)(4) that was in effect at the time of the instant trial, and would not necessarily apply to subsequent versions of the rule. We also make clear that we are not holding that a Rule 431(b)(4) violation could never result in reversible error. We determined in *Rivera II* that a trial before a biased tribunal would constitute structural error not subject to harmless-error review. However, because there was no evidence in *Rivera II* demonstrating that any juror was biased, we concluded that no structural error existed. *Rivera II*, 227 Ill. 2d at 20. If the facts in this case demonstrated that the trial court's failure to question the venire in accordance with Rule 431(b)(4) resulted in defendant being tried before a

biased jury, we would not hesitate to reverse defendant's conviction, as a trial before a biased jury would constitute structural error. However, there are no such facts in the instant case. We reject the idea that the trial court's failure to conduct Rule 431(b)(4) questioning makes it inevitable that the jury was biased, particularly when the record before us demonstrates that the jurors in this case were both admonished and instructed against forming an adverse inference against defendant based on his decision not to testify. To do so would require us to presume that citizens sworn as jurors ignore the law and the jury instructions given to them. This notion is contrary to our precedent which instructs us to make the opposite presumption. See *People v. Taylor*, 166 Ill. 2d 414, 438 (1995) ("The jury is presumed to follow the instructions that the court gives it").

Defendant maintains that we cannot assess whether the jury was biased because the Rule 431(b)(4) question was not asked. In *Rivera II*, we rejected the defendant's identical claim that the error could not be " 'qualitatively assessed for harm.' " *Rivera II*, 227 Ill. 2d at 20. We stated: "Contrary to defendant's argument otherwise, it may in fact be possible to qualitatively assess for harm *** by applying the rational juror standard to the evidence adduced against defendant. If the evidence is so overwhelming that no rational jury *** would have acquitted defendant of the offense, then Gomez's presence on the jury cannot be said to have prejudiced him." *Rivera II*, 227 Ill. 2d at 22. Courts have taken this same approach in cases dealing with similar issues. For example, in *Carter v. Kentucky*, 450 U.S. 288, 67 L. Ed. 2d 241, 101 S. Ct. 1112 (1981), the Supreme Court held that a criminal defendant has a fifth amendment right to a "no-adverse-inference" jury instruction if the defendant requests such an instruction. Although the Court has never reached the issue of whether a *Carter* error may be

considered harmless, several federal appellate courts have determined that *Carter* errors may be deemed harmless where the evidence against the defendant is overwhelming. *United States v. Brand*, 80 F.3d 560 (1st Cir. 1996); *Lewis v. Pinchak*, 348 F.3d 355 (3d Cir. 2003); *Beathard v. Johnson*, 177 F.3d 340 (5th Cir. 1999); *Finney v. Rothgerber*, 751 F.2d 858 (6th Cir. 1985); *Hunter v. Clark*, 934 F.2d 856 (7th Cir. 1991); *United States v. Soto*, 519 F.3d 927 (9th Cir. 2008); see also *People v. Carreon*, 225 Ill. App. 3d 133, 143 (1992).

Applying the same rationale here, we consider whether the evidence presented in the instant case is overwhelming. Defendant admitted that he committed the crimes in question three different times: first, to Keith Price, a person he has known since childhood; next, in an oral statement to Detective Gilger; and finally, in a videotaped confession. Michael Farris, an eyewitness to the crime who had also known defendant since childhood, positively identified defendant as one of the individuals involved in the shooting. Although the credibility of Price and of Farris was called into question because both are convicted felons with ties to the drug trade on Iowa and Lamon, the facts demonstrate that their respective testimony was corroborated by independent evidence, as well as defendant's statements. Additionally, defendant was linked to the murder weapon through his own testimony, the testimony of Price, and through Rastrelli's testimony that the bullet found in Brian's head came from the gun defendant admittedly used. Defendant argued that his confessions were coerced, but there was no evidence presented to support that claim. In light of these facts, we conclude that no rational juror would have acquitted defendant of the offenses for which he was charged. The evidence of defendant's guilt is overwhelming. Accordingly, we

conclude that the trial court's error was harmless beyond a reasonable doubt.

Defendant next contends that he was deprived of his right to a fair trial because the State committed prosecutorial misconduct in rebuttal argument. Specifically, defendant asserts that the State told the jury that a codefendant implicated defendant in violation of the trial court's order; repeatedly attacked defense counsel personally and improperly ridiculed the defense theory of the case; argued facts outside the record; misstated the law; and made a prejudicial comment comparing defendant's interrogation experience to jury service. Defendant admits that he did not object to any of these errors at trial, but asserts that his claims should not be forfeited because they were raised extensively in his posttrial motion. It is well settled that, to preserve an issue on appeal, a defendant must object to the purported error at trial and include it in his written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Defendant did not object to any of these alleged errors. Although he did include some of these claims in his posttrial motion, his arguments are nevertheless forfeited.

Defendant argues that this court should review his forfeited claims under the plain-error exception to the forfeiture rule. In *Herron*, 215 Ill. 2d at 186-87, we stated: "[T]he plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." We have already concluded that the evidence in this case was not closely balanced. Thus, our plain-error review is limited to the second prong of plain-error analysis. However, before considering whether the plain-error exception applies, we must first determine whether any

error occurred. *Herron*, 215 Ill. 2d at 187; *People v. Johnson*, 218 Ill. 2d 125, 139 (2005).

A prosecutor has wide latitude in making a closing argument and is permitted to comment on the evidence and any fair, reasonable inferences it yields. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005). Prosecutors may not argue assumptions or facts not contained in the record. *People v. Kliner*, 185 Ill. 2d 81, 151 (1998). A closing argument must be viewed in its entirety, and the challenged remarks must be viewed in their context. *People v. Buss*, 187 Ill. 2d 144, 244 (1999). Statements will not be held improper if they were provoked or invited by the defense counsel's argument. *People v. Kirchner*, 194 Ill. 2d 502, 553 (2000). With these rules in mind, we consider defendant's claims of error.

Defendant first asserts that the prosecutor violated the trial court's ruling prohibiting the State from eliciting evidence demonstrating that defendant was implicated in the crime by a codefendant. Defendant argues that the prosecutor's remarks were erroneous because they injected an out-of-court identification of defendant as well as a codefendant's inculpatory statement into the trial through closing argument.

During cross-examination by defense counsel, Detective Gilger was asked why he did not memorialize defendant's statement denying participation in this crime. Detective Gilger responded that he "knew" defendant was lying. On redirect examination, the State was permitted to ask Detective Gilger whether he had information at the time of defendant's questioning which helped him gauge the veracity of defendant's statements. Detective Gilger answered this question affirmatively, but did not disclose the basis of this knowledge. In closing argument, defense counsel stated:

"Detective Gilger. He of the super powers to be able to know when someone is lying, even though he himself did

not witness the shooting, didn't see a video of it, wasn't there, didn't hear it, but yet he claims to know. Well, you mean, you don't believe or is it know. He used the word know. \*\*\* When Michael Glasper is willing to talk to the detective and give a statement, do they call felony review \*\*\* to come down and take a video of that? No. Why? Because Detective Gilger says, well, I know he's lying. So I'm not going to do that. So, he picks and chooses when they're going to document for you to watch the actual statements."

The prosecutor argued in rebuttal:

"Detective Gilger told you when he talked to this guy here [defendant], he already knew facts about the case. And remember who was in custody a month before they talked to Michael Glasper? Eugene Banks, okay? So when the police talked to this guy, the detective tells you there's things he already knows about this case that already match the evidence that he has. But what's the very important fact that the defendant adds that the police didn't know? Remember, Eugene's in custody, Boo."

The record demonstrates that, prior to closing arguments, the jury was made aware of facts showing that Banks was in custody for a month before defendant was arrested. These facts were elicited from both the State and the defense. Defendant cannot complain that the State made reference to evidence in closing which defendant helped elicit. See *People v. Kliner*, 185 Ill. 2d 81, 159 (1998) ("defendant cannot now complain about prosecutorial comments relating to evidence which defense counsel elicited"). The prosecutor's argument was based on a reasonable inference derived from the evidence presented, and did not expose the jury to any additional information that would have otherwise been excluded. Moreover, the prosecutor's comments were invited by defendant's attempt to discredit Detective Gilger by discussing his "super powers" and questioning his ability to "know" that defendant was lying. Accordingly, we find no error.

Defendant next asserts that the State committed error when the prosecutor personally attacked defense counsel in rebuttal argument. Defendant first takes issue with the prosecutor's comments that defense counsel was "mocking" or "making fun of" Officer Akins. The record shows that defense counsel cross-examined Officer Akins extensively about his decision to move the hooded sweatshirt and gun from the gangway where it was found to a better lit area near other police officers. The cross-examination highlighted Officer Akins' testimony that he felt unsafe in the gangway, despite having a gun, bullet proof vest, radio, and other items identifying him as a police officer in his possession. During closing argument, defense counsel referenced this testimony, and criticized Officer Akins' decision to move the sweatshirt and gun, stating:

> "[H]e recovered this murder weapon and the sweatshirt at a particular location and then really had no reason as to why he doesn't leave it there for the evidence technician to take pictures of it. Well, there weren't other officers there. Yeah, there were. *** He had a working radio. He had a gun. All he had to do was use his radio to call for a supervisor or for a sergeant to come bring him crime scene tape ***. He didn't do it."

In rebuttal, the State argued:

> "And the laughter and the insults to Officer Akins. Because he's concerned for his personal safety, he should be mocked in some way because he's in a dangerous neighborhood, because he's in a gangway, because there's a couple of people milling about. *** He gets out of the dark gangway and goes to other police. And he should be made fun of? You're right. Because nobody with a radio, a bulletproof vest, or a gun is ever the victim of a crime themselves. So let's make fun of Officer Akins for getting himself to personal safety ***. And why again are we fighting *** so hard to keep it out? Because Michael Glasper in his flight from the police dropped the hoodie and the gun on Walton, and the gun matches the bullet in the brain of our dead

gentleman, Brian Simmons. So, again, that's why we need to make fun of Officer Akins to keep that evidence from your consideration."

We cannot discern from the record whether defense counsel's argument was "mocking" in tone. The record does demonstrate, however, that defense counsel's argument was intended to criticize Officer Akins' conduct. The State's characterization of defense counsel's criticism as some form of mockery, when read in context, cannot be construed as a personal attack against defense counsel. See *People v. Hooper*, 133 Ill. 2d 469, 490 (1989) (finding that prosecutor did not personally attack defense counsel when he argued " 'Dave O'Callaghan, ten years on the job, he's got to come in here and be humiliated and demeaned by [defense counsel]?' "). It is well settled that it is improper for the State to suggest that defense counsel fabricated a defense theory, used trickery or deception, or suborned perjury. *Kirchner*, 194 Ill. 2d at 549. However, it is not error for the State to challenge a defendant's credibility or the credibility of his theory of defense when evidence exists to support the challenge. *Kirchner*, 194 Ill. 2d at 549. In this case, the State may have been better served to use terms other than "mocking" or "making fun of" to challenge the defense's theory that Officer Akins was being dishonest. However, the record is clear that the State's argument was based on the evidence and was made in response to defendant's attempts to convince the jury that portions of Officer Akins' testimony were incredible.

Defendant next asserts that the State personally attacked defense counsel by arguing that counsel mocked Price and Farris. The record shows that defense counsel questioned both Farris and Price on cross-examination about their dishonest conduct, criminal behavior, drug use, and participation in the drug trade. In closing argument, defense counsel reemphasized these points.

Defense counsel pointed out that Farris sold drugs and used alias names. Counsel called Price a "drug addict," discussed his felony convictions, and stated that Price "can't keep his story straight" on the witness stand. In response, the State argued:

"So, when he's out there and sees his friends, Michael Farris and Keith Price, it's as if he sees nobody. They're not a blip on the radar for him. *** [H]e knows that either Michael Farris and Keith Price out of the street loyalty friendship that they feel for him will never come into this courtroom and say what they saw. Or if they do, they're going to be subjected to cross-examination, and they're going to be subjected to questions. And they're going to be made fun of and mocked as liars, convicted felons and drug dealers. So, who would believe them anyway?"

Once again, we cannot discern defense counsel's tone from the record and cannot say whether the terms "made fun of" and "mocked" were accurate characterizations. Nevertheless, we find no error because the State's comments did not rise to the level of an inappropriate personal attack on defense counsel (see *Hooper*, 133 Ill. 2d at 490) and were invited by defense counsel's comments concerning Price and Farris (see *People v. Wright*, 218 Ill. App. 3d 764, 780-81 (1991) (where the following argument was held to be proper as invited by defense counsel's closing: " '[y]ou think it was easy for her to get up there and withstand [defense counsel's] cross-examination, [defense counsel's] little insinuations, [defense counsel's] cheap shots that she was doing something?' ")).

Defendant also claims that the State committed error when it argued that the defense mocked forensic scientist Rastrelli. During cross-examination, defense counsel questioned Rastrelli about the accuracy of her scientific findings in light of pressure she received from the police to "rush" her examination of the evidence. Then, in closing, defense counsel argued that Rastrelli was "tailor-

ing" her scientific testimony to fit the State's version of the case. Defense counsel argued that Rastrelli's testimony was influenced by the police, and stated that the evidence showed "that a sergeant or detective over the phone to a scientist from the Illinois State Police can have that much pressure—over the phone to get them to make an identification they probably would not have made anyway." In rebuttal, the State argued:

"First, the Defense concedes there was not a single question of Kris Rastrelli about her expertise, not one... . Oh, she is an expert, Judge. But then when she gets on the stand she's mocked, I guess, for being really no more knowledgeable about firearms identification than anyone here in this room and for being some kind of police stooge."

Defense counsel waged several strong accusations against Rastrelli, questioning her integrity as a scientist and accusing her of altering her scientific findings to pacify the police. The State's argument was made in response to defendant's accusations and, when viewed in context, was invited by defense counsel's remarks. The State did not attack defense counsel personally in making the argument; rather, the State responded to counsel's theory that Rastrelli's testimony was fabricated as a result of immense police pressure. Accordingly, we find no error.

Next, defendant asserts that the State personally attacked defense counsel when it accused counsel of making fun of Detective Gilger. During closing argument, defense counsel maintained that Detective Gilger's partner was sent home so Detective Gilger could coerce defendant into confessing. Defense counsel argued, "[d]etective Gilger is going to have to come up with an explanation as to why he was alone with Michael Glasper because the usual practice *** was that there's two detectives. *** The partner gets sent home when Michael Glasper denies knowledge of what's going on, denies gang

involvement. Okay. You go home. Detective Gilger, you go in there and get that statement."

In rebuttal, the State argued:

"And to make fun of the fact, this just did happen to be a strange day in our nation's history. *** [R]eally the police looked at it, evaluated it, and said we can only spare one detective on this because we might need the other detectives to do other things. So, sending Detective Balodimas home, nobody knew if Detective Balodimas was going to be called out at midnight on September 12 of 2001 to do something else for security purposes for the police."

Viewing defendant's argument and the State's response in context, we find that the State's comments were intended to rebut the defense's theory that Detective Gilger's partner was sent home so Detective Gilger could coerce defendant's confession. The State's argument was a proper challenge to the defense theory and does not amount to an erroneous personal attack on defense counsel.

Defendant next asserts that the State improperly ridiculed his theory of the case when it stated that it was "fashionable" to criticize law enforcement and that such arguments "made no sense." The record shows that defendant made the following statements in closing argument:

"Well, thank God he chose the videotaped statement because we can see him shaky in that video. We can see him breaking down in that video. We can see his eyes darting to the detective who's in the room. And why is the detective in there anyway? *** Well, is he there to provide protection for you? Yeah, yeah. That's the one she wants to go with, right? He is a murderer, therefore, I am afraid. *** Or is it that the detective is in there for Michael Glasper? You better be on page with this because you remember what happened earlier. That's why he's in there."

The State responded in rebuttal:

"And, you know, the whole thing about that video confession, it's become so fashionable right now in our society to

blame the police. Oh, the ends justify the means. And I guess for assistant state's attorney Kim Ward, the licensed attorney, the ends justify the means. Let's make fun of it and just say, you know what? These guys aren't out there doing their jobs, these men and women in uniform. Lawyers like Kim Ward aren't out there doing her job. They are looking out there to frame people like defendant. That makes no sense."

The State's remarks, when viewed in context, were appropriate responses to the defense's argument. Further, the State's argument was proper in light of the evidence, as there was no legitimate factual basis for defendant's coercion theory.

Defendant next asserts that the State argued that certain witnesses did not come forward because they feared defendant, and this argument was not based on the evidence. At trial, Farris testified that there were two women with children present on the street when he witnessed the crime in question. Defense counsel discussed this testimony in closing, and asked, "[d]o these people [the women] testify for the State? No. Why is that?" In rebuttal, the State argued: "And where are the girls, the young girls out there with their kids? Where do you think they are? Maybe, they didn't see anything. Maybe, they don't want to come forward. But use your common sense. Where do you think the young mothers with their kids are?" Viewing the argument in context, we find that defendant's characterization of the prosecutor's comments is unsupported by the record. Further, the prosecutor's statements were invited by the defense. The comments do not amount to error.

Defendant also maintains that the State misstated facts when it characterized Price and Farris as "friends" of defendant. Both Price and Farris testified that they knew defendant since childhood. Further, Price testified that defendant confided in him about the events of August 11, 2001, explaining that Banks fainted, defen-

dant tried to help him, and left the sweatshirt and gun in the process. In light of this evidence, the State's characterization of their relationship as that of "friends" was a reasonable inference from the evidence.

Defendant further asserts that the State misstated the law and shifted the burden of proof to defendant when it argued, in response to defendant's argument that his confession was coerced: "And that stuff that happened in that room earlier? Where's the evidence of that? Where is the evidence that this guy was treated anything other than as good as you are here in this room?"

The record demonstrates that defense counsel repeatedly argued that defendant was coerced into confessing by Detective Gilger and the assistant State's Attorney. The State did not shift the burden of proof to defendant, or imply that defendant was required to present evidence; rather, the State pointed out that no evidence existed in this case to support defendant's theory of coercion. Defendant maintains that the State's comments were akin to the comments deemed improper in *People v. Giangrande*, 101 Ill. App. 3d 397, 401-02 (1981), where the prosecutor asked, "[W]here's the evidence that defendant didn't do it." We disagree. The comment in *Giangrande* was improper because it suggested that defendant was required to present evidence tending to prove his innocence. The State's comments here made no such suggestion, were invited by defense counsel's argument, and were reasonable in light of the facts presented in this case.

Defendant next asserts that the State misstated the law with respect to the duties of the jury foreperson when it stated: "The job of the foreperson is to keep everybody on track. *** [I]f somebody comes up with a wild unsubstantiated theory that somehow Michael Glasper was somehow harmed in police custody when again you

haven't heard a shred of evidence that that happened, it's the job of the *** foreperson to keep everyone on track and confine what you talk about to the evidence and reasonable inferences to be drawn from the evidence, not wild theories."

Illinois Pattern Jury Instructions, Criminal, No. 26.01 (4th ed. 2000) (IPI Criminal 4th), provides: "When you retire to the jury room you first will elect one of your members as your foreperson. He or she will preside during your deliberations on your verdicts." The dictionary definition of the word "preside" is "to occupy the place of authority," to "act as president, chairman, or moderator," or to "direct, control, or regulate proceedings as chief officer." Webster's Third New International Dictionary 1794 (1993). The prosecutor's statements that the foreperson's job is "keep everybody on track" or "confine what you talk about to the evidence" arguably fall within this definition. Nevertheless, we find that the prosecutor's comments were improper. Read as a whole, the prosecutor's statement amounted to an instruction to the jury foreperson to forbid discussion of the defense's theory that defendant was coerced into confessing. While the State may argue against a defendant's theory of the case, the State cannot instruct the jury to refrain from considering that theory.

Having concluded that the State committed error, we proceed under the second prong of the plain-error analysis as set forth in *Herron* and consider whether "the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *Herron*, 215 Ill. 2d at 187. We find that the error does not meet these criteria. After the prosecutor made the erroneous statement, the jury was instructed by the trial judge that the role of the foreperson was to "preside" over deliberations and that the ultimate decision had to be unanimous. The jury was further

instructed to consider the "testimony of the witnesses, the exhibits and the stipulations which the court has received" and to "consider all the evidence in the light of your own observations and experience in life." See IPI Criminal 4th No. 101. The jury was also instructed that closing arguments "are made by the attorneys to discuss the facts and circumstances in the case and should be confined to the evidence and to reasonable inferences to be drawn from the evidence, and any statement or argument made by the attorneys which is not based on the evidence should be disregarded." See IPI Criminal 4th No. 1.03.

The jury was admonished to consider the evidence and the reasonable inferences that could be drawn therefrom. We do not believe that one incorrect comment made by the State during argument would be sufficient to confuse the jury and cause it to ignore the clear instructions given to it by the court as to the proper course of its deliberations. See *People v. Truss*, 254 Ill. App. 3d 767, 778 (1993). Accordingly, we decline to apply the plain-error exception to the forfeiture rule with regard to this error.

Finally, defendant argues that the State committed reversible error when it stated: "And to talk about he was in custody ten hours and to talk about he was in a locked room fed at certain times, not to go to the bathroom, his schedule wasn't his own, it sounds a lot like jury service, ladies and gentlemen. And are any of you ready to confess to a murder you didn't commit?" Defendant asserts that this remark was prejudicial because the jurors were lead to believe that defendant was interrogated in "fine" conditions which would not have caused him to "break down" and confess.

The jurors were presented with evidence concerning the conditions of defendant's interrogation and could draw their own inferences from the record as to whether

those conditions would cause defendant to confess. The State's argument concerning those conditions was proper in light of that evidence. However, it was improper for the State to ask the jurors to place themselves in defendant's position and determine whether they would confess under those circumstances. The prosecutor's comment was irrelevant and had no purpose other than to distract the jurors from their duty—assessing the evidence in the case. See *People v. Johnson*, 208 Ill. 2d 53, 83-84 (2003).

Even though the remark was improper, we do not find that the error was so serious that the second prong of the plain-error test is satisfied. See *People v. Alvine*, 173 Ill. 2d 273, 292 (1996) (holding that plain-error exception did not apply where prosecutor asked jury to assume the role of the victim in closing argument). The jury was instructed to base its decision on the evidence before it. We cannot conclude that the prosecutor's argument about a hypothetical scenario was so prejudicial that the jurors ignored the instructions and based their decision on a make-believe situation.

Defendant next alleges that he has demonstrated a pattern of prosecutorial misconduct which requires a new trial. We disagree. As we have already concluded, the evidence in this case was overwhelming, the errors committed by the prosecutor did not render the trial unfair, and no plain error existed. " 'The whole can be no greater than the sum of its parts ***.' " *People v. Wood*, 341 Ill. App. 3d 599, 615 (2003), quoting *People v. Albanese*, 102 Ill. 2d 54, 82-83 (1984). Accordingly, we reject defendant's argument. *People v. Scott*, 148 Ill. 2d 479, 549 (1992).

Defendant finally asserts that he was denied the effective assistance of counsel based on counsel's failure to object to the remarks challenged by defendant herein. Although we have concluded that two of the remarks in

question were erroneous, we have also concluded that the erroneous remarks did not deprive defendant of a fair trial. Defendant cannot demonstrate that counsel's failure to object prejudiced the outcome of his trial, as the *Strickland* test requires. See *People v. Caffey*, 205 Ill. 2d 52, 133 (2001).

## CONCLUSION

For the reasons set forth above, we conclude that defendant was not deprived of his right to a fair trial based on the trial court's *Zehr* violation or the State's rebuttal argument. Accordingly, we affirm the judgment of the appellate court affirming defendant's conviction.

*Affirmed.*

JUSTICE BURKE, dissenting:

I agree with the majority's conclusion that the trial court violated Supreme Court Rule 431(b)(4) (177 Ill. 2d R. 431(b)(4)) and *People v. Zehr*, 103 Ill. 2d 472 (1984), when—despite defendant's request to do so—the court refused to ask potential jurors whether they understood and accepted that the defendant's exercise of his right not to testify could not be held against him. I disagree, however, with the majority's conclusion that the trial court's error does not warrant reversal because, in light of the weight of the evidence produced at trial, the error was harmless beyond a reasonable doubt. *Zehr* expressly holds that the *voir dire* error at issue here is prejudicial error requiring reversal and, therefore, harmless-error analysis is inapplicable. Accordingly, I dissent.

The general principles governing *voir dire* are well established. Both the United States and Illinois Constitutions guarantee an accused the right to trial by an impartial jury. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, §§8, 13; *People v. Strain*, 194 Ill. 2d 467, 475 (2000); see generally G. Braden & R. Cohn, The Illinois

Constitution: An Annotated & Comparative Analysis 41 (1969). To secure this right, inquiry is permitted during *voir dire* " 'to ascertain whether the juror has any bias, opinion, or prejudice that would affect or control the fair determination by him of the issues to be tried.' " *People v. Lobb*, 17 Ill. 2d 287, 300 (1959), quoting *Connors v. United States*, 158 U.S. 408, 413, 39 L. Ed. 1033, 1035, 15 S. Ct. 951, 953 (1895); 177 Ill. 2d R. 431. The extent and scope of the *voir dire* examination rests generally within the discretion of the trial court. *Strain*, 194 Ill. 2d at 476. However, this discretion is not unbounded. Jurors "must harbor no bias or prejudice which would prevent them from returning a verdict according to the law and evidence." *Strain*, 194 Ill. 2d at 476. Accordingly, " 'a failure to permit pertinent inquiries to enable a party to ascertain whether the minds of the jurors are free from bias or prejudice which would constitute a basis of challenge for cause, or which would enable him to exercise his right of peremptory challenge intelligently, may constitute reversible error.' " *Strain*, 194 Ill. 2d at 476-77, quoting *Lobb*, 17 Ill. 2d at 300. See also, *e.g.*, *Gomez v. United States*, 490 U.S. 858, 876, 104 L. Ed. 2d 923, 939, 109 S. Ct. 2237, 2248 (1987) ("errors occurring during jury selection may be grounds for reversal of a conviction"); *United States v. Brown*, 799 F.2d 134, 135-36 (4th Cir. 1986) ("Although the trial court has broad discretion in the conduct of voir dire, an abuse with resulting reversible error will occur where the court's restriction hindered defendant's opportunity to make reasonable use of his challenges").

In *Zehr*, this court considered whether the trial court's failure to permit certain inquiries requested by the defendant during *voir dire* constituted reversible error. The questions tendered by the defendant would have asked the jurors whether they understood and accepted that the State has the burden of proof, that the defen-

dant's right not to testify may not be held against him, and that the defendant is presumed innocent. *Zehr*, 103 Ill. 2d at 476. The trial court refused to ask the questions, but did instruct the jurors concerning the burden of proof, the presumption of innocence, and the defendant's right not to testify. In addition, the jurors were asked whether they would follow the law as given them by the court even though they might personally disagree with it and whether any reason, moral, religious or otherwise, would prevent their being fair and impartial. *Zehr*, 103 Ill. 2d at 476-77. The defendant did not testify at trial and was convicted.

On appeal, the appellate court reversed, holding that the trial court had abused its discretion in failing to include the defendant's questions in the *voir dire* examination. *Zehr*, 103 Ill. 2d at 475. This court affirmed the judgment of the appellate court, stating:

"We are of the opinion that essential to the qualification of jurors in a criminal case is that they know that a defendant is presumed innocent, that he is not required to offer any evidence in his own behalf, that he must be proved guilty beyond a reasonable doubt, and that his failure to testify in his own behalf cannot be held against him. If a juror has a prejudice against any of these basic guarantees, an instruction given at the end of the trial will have little curative effect. It is also vital to the selection of a fair and impartial jury that a juror who finds that the State has failed to sustain its burden of proof of guilt beyond a reasonable doubt have no prejudices against returning a verdict of not guilty. We note parenthetically that it is equally important that a juror who finds that the State has sustained its burden of proof have no prejudice against returning a verdict of guilty. We agree with the appellate court that '[e]ach of these questions goes to the heart of a particular bias or prejudice which would deprive defendant of his right to a fair and impartial jury' (110 Ill. App. 3d 458, 461), and although they need not have been asked in precisely the form submitted, the subject matter

of the questions should have been covered in the course of interrogation on *voir dire*." *Zehr*, 103 Ill. 2d at 477.

Based on this reasoning, we held that "[t]he refusal to ask the questions resulted in prejudicial error which required reversal." *Zehr*, 103 Ill. 2d at 477-78.

The holding in *Zehr* was subsequently codified in Supreme Court Rule 431(b) (177 Ill. 2d R. 431(b)). See 177 Ill. 2d R. 431, Committee Comments, at lxxix (Rule 431(b) "is intended to ensure compliance with the requirements of *People v. Zehr*, 103 Ill. 2d 472 (1984)"). At the time of defendant's trial in this case, Rule 431(b) required the trial judge, if requested by the defendant, to ask

"each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.

The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." 177 Ill. 2d R. 431(b).

In accordance with Rule 431(b)(4) and *Zehr*, defendant in the case at bar asked the trial court to question the venire as to whether they understood that his right not to testify could not be held against him. The judge refused, stating:

"I don't ask them about that. I tell them. I give them the law thing and I don't want any questions about it."

Defendant did not testify and was convicted. The appellate court affirmed. No. 1—04—3005 (unpublished order under Supreme Court Rule 23).

On its relevant facts, the present case is indistinguishable from *Zehr*. Here, as in *Zehr*, defendant asked the

trial court to question prospective jurors as to whether they understood that his exercise of the right not to testify could not be held against him. As in *Zehr*, the trial court refused to do so. And, like the defendant in *Zehr*, defendant in this case now argues on appeal that the trial court's failure to ask the requested question constitutes reversible error. The issue presented in *Zehr* and the issue posed here are identical. Resolution of this case should therefore be a simple matter of applying the holding of *Zehr*, as well as Rule 431(b)(4), and reversing the judgment of the appellate court.

The majority, however, concludes otherwise. The majority holds that reversal is not required in this case because the evidence of defendant's guilt is overwhelming and, when weighed against this evidence, the trial court's error in refusing to question the venire was harmless "beyond a reasonable doubt."[4] 234 Ill. 2d at 203. I disagree with this result for several reasons.

First, although the majority acknowledges that language in *Zehr* may have "suggest[ed]" that reversal is required when the trial court fails to properly interrogate the venire (234 Ill. 2d at 197), the majority nevertheless determines that it is appropriate to apply harmless-error analysis in this case because "there is no indication that the *Zehr* court contemplated, or was even asked to contemplate, whether harmless error could apply" (234 Ill. 2d at 190). Thus, according to the majority, the issue is one of "first impression" (234 Ill. 2d at 189). This is incorrect.

Prejudicial error is reversible error. It is the opposite

---

[4]It is not clear why the majority chooses to use the harmless "beyond a reasonable doubt" standard here since that standard is used for constitutional error (see *In re E.H.*, 224 Ill. 2d 172, 180-81 (2006)), and the majority has concluded that constitutional error did not occur in this case (see 234 Ill. 2d at 196).

of harmless error. *Zehr* held that the failure to ask the tendered questions was "prejudicial error which required reversal." *Zehr*, 103 Ill. 2d at 478. Unquestionably then, the court in *Zehr* rejected the proposition that the failure to ask the proposed questions was harmless error. Indeed, having found prejudicial, reversible error in the *voir dire* proceeding, when the trial judge refused to ask the proposed questions, there would have been no reason for the *Zehr* court to then go on and examine the evidence subsequently produced at trial—that evidence was simply irrelevant.

It is important to note that, in finding prejudicial, reversible error, the court in *Zehr* was applying a principle which has long been the law in Illinois: the failure to permit *voir dire* questioning which pertains to a critical area of potential bias is prejudicial error because it deprives the defendant of the right to select an impartial jury. As early as 1873, for example, in *Lavin v. People*, 69 Ill. 303 (1873), this court applied this principle when it considered whether a trial court's failure to ask the venire if they were members in or affiliated with a temperance society required reversal of the defendant's conviction for violating a liquor law. Addressing this issue, this court stated:

> "It is the policy of our laws to afford each and every person who may have a cause for trial in our courts, a fair and impartial trial. This can only be done by having the mind of each juror who sits to pass judgment upon the life, liberty or rights of a suitor entirely free from bias or prejudice. In order to determine whether the person who may be called as a juror possesses the necessary qualifications, whether he has prejudged the case, whether his mind is free from prejudice or bias, the suitor has the right to ask him questions, the answer to which may tend to show he may be challenged for cause, or disclose a state of facts from which the suitor may see proper to reject such juror peremptorily." *Lavin*, 69 Ill. at 304-05.

The court went on to hold:

> "That the refusal of the court to permit the questions asked to be answered, was error, for which the judgment should be reversed, there can be no doubt. [Citations.]
>
> It can not be said the cause was tried by a jury, such as is contemplated by law." *Lavin*, 69 Ill. at 306.

More recently, in *People v. Stack*, 112 Ill. 2d 301 (1986), this court held that the failure to allow a question tendered by the defendant regarding the insanity defense was prejudicial, reversible error. In so holding, the court noted that the insanity defense was a controversial legal issue against which members of the community may have been prejudiced. The court stated:

> "Inquiry into the feeling or viewpoint of the venire regarding such controversial legal propositions is consistent with a *bona fide* examination conducted so that the parties can intelligently exercise their prerogatives to challenge. Furthermore, a defendant's sixth and fourteenth amendment rights to an impartial jury (U.S. Const., amends. VI, XIV) are diminished when jurors are prejudiced against an appropriate verdict of not guilty by reason of insanity." *Stack*, 112 Ill. 2d at 312-13.

As in *Zehr*, the *Stack* court rejected the State's argument that a general admonition to the jury to follow the law was sufficient to address any potential bias. The court concluded that such an admonition would be inadequate to protect the "defendant's right to an impartial jury." *Stack*, 112 Ill. 2d at 313.

In *People v. Strain*, 194 Ill. 2d 467 (2000), this court held that the failure to permit certain *voir dire* questions regarding gang bias required reversal of the defendant's conviction. We held:

> "The trial court was required to conduct *voir dire* in a manner to assure the selection of an impartial panel of jurors, free from bias and prejudice. Because of the trial court's refusal to probe for gang bias, defendant was denied an informed and intelligent basis on which to assert chal-

lenges for cause or to exercise peremptory challenges."
*Strain*, 194 Ill. 2d at 481.
See also, *e.g.*, *People v. Jimenez*, 284 Ill. App. 3d 908, 913
(1996) ("Defendant need not prove that the jury impan-
elled actually harbored prejudice against him. [Citation.]
Because of the improper refusal of an appropriate ques-
tion, which would have tested an area of potential bias
not covered by other questions [regarding gang bias], the
conviction must be reversed"); *People v. Oliver*, 265 Ill.
App. 3d 543, 551 (1994) (trial court's failure to pose ques-
tions regarding the insanity defense meant that "[t]he
conduct of jury selection proceedings in this case did not
ensure that defendant would be afforded his constitu-
tional right to a trial before an impartial jury"); *People v.
Lanter*, 230 Ill. App. 3d 72 (1992) (reversible error in fail-
ing to allow *voir dire* questioning regarding drugs and
alcohol).

In each of the foregoing cases, courts of review in
this state have held that where the tendered questions
go to a critical area of potential bias, a general instruc-
tion or admonition could not ensure that the defendant
would be tried before an impartial jury and, therefore,
the failure to ask the questions was prejudicial, revers-
ible error. It was this principle of law that was relied
upon by the defendant in *Zehr*. See 234 Ill. 2d at 190
(taking judicial notice of the briefs filed in *Zehr*). Citing
to cases such as *People v. Lobb*, 17 Ill. 2d 287, 300 (1959),
and *People v. DeLordo*, 350 Ill. 148 (1932), the defendant
in *Zehr* argued that "[t]he failure to ask the tendered
questions prejudiced [him] by denying him the op-
portunity to make challenges for cause and to exercise
his peremptory challenges intelligently, thereby thwart-
ing the selection of an impartial jury." This court agreed.
*Zehr*, 103 Ill. 2d at 477. Indeed, the only difference
between the cases discussed above and *Zehr* is that, un-
like questions regarding gangs or the insanity defense,

which are case specific, the questions tendered in *Zehr* apply to every criminal case, regardless of the facts— which of course is why the holding of *Zehr* was subsequently codified in a supreme court rule.

Reversal in *Zehr* had nothing to do with whether the evidence produced at trial was closely balanced. Instead, reversal was premised on this court's conclusion that the failure to ask the tendered questions violated the defendant's right to select an impartial jury and was, therefore, prejudicial, reversible error. Thus, in my view, the majority's statements that the application of harmless error in this case is an issue of "first impression" and that *Zehr* merely "suggests" that reversal is required are simply not defensible.

In support of their decision to apply harmless-error analysis in this case, the majority points to *People v. Emerson*, 122 Ill. 2d 411 (1987). According to the majority, *Emerson* "moved away" from *Zehr*'s holding that the failure to ask the tendered questions amounts to "prejudicial error" (234 Ill. 2d at 197) and, therefore, harmless-error analysis is appropriate. Again, I disagree.

Initially, I note that if the application of harmless error is in fact being addressed for the first time in this case, then there could not have been a previous holding for *Emerson* to "move away" from. The majority's statement that *Emerson* "moved away" from *Zehr*'s finding of prejudicial error is a tacit admission that the application of harmless error is not, after all, an issue of first impression.

Moreover, the majority's contention that *Zehr*'s finding of prejudicial error is no longer valid in light of *Emerson* fails on the merits. In *Emerson*, the defendant contended that, in violation of *Zehr*, "the trial judge erred in failing to question the venire more thoroughly with respect to their attitudes concerning the presumption of innocence." *Emerson*, 122 Ill. 2d at 425. This

court disagreed, holding that the trial judge sufficiently complied with *Zehr*. *Emerson*, 122 Ill. 2d at 427. Although the trial judge did not individually question the jurors about the presumption of innocence, the judge did question the venire as a whole as to whether they understood that the defendant was innocent until proven guilty beyond a reasonable doubt and whether they would follow the law. Further, the judge posited a hypothetical to the venire which explained the presumption of innocence. *Emerson*, 122 Ill. 2d at 426. Based on these facts, we concluded that the "purpose expressed in *Zehr*" had been satisfied such that the *voir dire* was sufficient to insure the selection of a fair and impartial jury. *Emerson*, 122 Ill. 2d at 427.

Contrary to the approach taken by the majority in this case, *Emerson* makes it clear that the proper way to address a defendant's challenge regarding a trial court's failure to pose *Zehr* and Rule 431(b) questions is to consider the quality of the *voir dire* proceeding, not the weight of the evidence produced at trial. Indeed, if anything, *Emerson* did not "move away" from *Zehr*'s holding that the *voir dire* error is prejudicial error, it reaffirmed it. Applying the approach of *Emerson* here, it is apparent that reversal is required since, as in *Zehr*, no questions whatsoever were asked of the venire regarding defendant's right not to testify. See *People v. Starks*, 169 Ill. App. 3d 588, 593 (1988) (finding reversible error where "no preimpanelment question posed to prospective jurors individually or as a group tested them specifically as to their attitude toward defendant's failure to testify").

Furthermore, regardless of whether the majority actually views the application of harmless error as an issue of first impression or not, I cannot agree with the adoption of that standard in this case because it cannot be reconciled with the nature of the error identified in

*Zehr.* Here, at the outset of its analysis, the majority emphasizes that *Zehr* is "long-standing precedent" and strongly reaffirms "this court's mandate in *Zehr*" which requires that the tendered questions be asked. 234 Ill. 2d at 189. But *Zehr* holds that the trial court is required to ask the tendered questions because they are "essential" to obtaining an impartial jury. *Zehr*, 103 Ill. 2d at 477. By definition, the absence of something that is an "essential" requirement to ensuring an impartial tribunal cannot be harmless. See *People v. Cole*, 54 Ill. 2d 401, 411 (1973) ("The right to a trial by an impartial tribunal is so basic that a violation of the right requires a reversal"). By reaffirming *Zehr* but then applying harmless error, the majority is embracing a contradiction. This cannot be correct.

The majority attempts to get around this problem, in part, by stating that its holding that harmless-error analysis applies in this case does not mean "that a Rule 431(b)(4) violation could never result in reversible error." 234 Ill. 2d at 200. The majority explains:

"If the facts in this case demonstrated that the trial court's failure to question the venire in accordance with Rule 431(b)(4) resulted in defendant being tried before a biased jury, we would not hesitate to reverse defendant's conviction, as a trial before a biased jury would constitute structural error." 234 Ill. 2d at 200-01.

Notably, however, at no point in its opinion does the majority explain how jurors harboring bias against a defendant's right not to testify can be identified if defense counsel is precluded from making the relevant inquiry on *voir dire*. Certainly, in cases where a juror is challenged for cause based on a response to a question that was actually given, there would be record evidence for an appellate court to review to determine whether there was bias. But that is impossible to do when the question is not asked in the first place. The fact of the matter is, if

the question is precluded, there will be no evidence of record to establish juror bias. The Supreme Court of Kentucky recognized this point in *Hayes v. Commonwealth*, 175 S.W.3d 574 (Ky. 2005):

> "If any jurors who sat in judgment of [the defendants] had expressed such a prejudice [against the defendants' right not to testify], the trial court would have been required to strike those jurors for cause. But how could defense counsel identify jurors holding such prejudice if defense counsel is precluded from making the relevant inquiry on voir dire? By limiting the voir dire to exclude any inquiry into that issue on the notion that to do so might give the defendants an unfair advantage during closing arguments, the trial court prevented them from identifying any jurors so prejudiced and thereby precluded the exercise of possible challenges for cause and interfered with the intelligent exercise of peremptory strikes." *Hayes*, 175 S.W.3d at 585.

Citing to our own decision in *Zehr*, the Kentucky court went on to conclude:

> "[T]he failure to permit counsel to ascertain during voir dire whether any of the prospective jurors would hold against them the fact that they exercised their Fifth Amendment privilege not to testify was an abuse of discretion that denied [the defendants] their fundamental right to a fair and impartial jury, an error that is not subject to harmless error analysis." *Hayes*, 175 S.W.3d at 586.

The *Hayes* court properly understood our opinion in *Zehr* and recognized what the majority here does not: once the threshold determination is made that a tendered *voir dire* question goes to a critical area of potential bias that cannot be ameliorated by admonitions or instructions and, therefore, the failure to pose the question denies the defendant the right to select a fair and impartial jury, the weight of the evidence is irrelevant and harmless-error analysis is necessarily inapplicable. See, *e.g.*, *Strain*, 194 Ill. 2d at 476-77; *Stack*, 112 Ill. 2d at 311-13; *Lobb*, 17 Ill. 2d at 300; *Lavin*, 69 Ill. at 304-06.

The majority's improper labeling of the harmless-error issue as one of first impression; the self-contradicting and unpersuasive contention that this court "moved away" from *Zehr*'s finding of prejudicial error in *Emerson*; and the contradiction between the majority's reaffirmance of *Zehr* on the one hand and the adoption of harmless-error analysis on the other are all problems that relate to the central issue of whether harmless-error analysis should be applied to a violation of *Zehr* and Rule 431(b)(4). There is, however, an additional problem with the majority opinion that relates to the nature of the underlying error itself.

Stating that Rule 431(b)(4) questioning is not constitutionally required, the majority reaches the following conclusion:

"[W]e cannot say that Rule 431(b)(4) questioning is indispensable to a fair trial." 234 Ill. 2d at 196.

Then, addressing the problem of juror bias directly, the majority discounts any concerns regarding bias in this case because the jurors

"were both admonished and instructed against forming an adverse inference against defendant based on his decision not to testify." 234 Ill. 2d at 201.

These statements represent a complete reversal of our holding in *Zehr* that questioning the jury regarding a defendant's right not to testify is essential to ensuring an impartial jury and a fair trial, and that admonitions and instructions are inadequate to address the potential bias against that right. They also represent a complete turnabout from the position taken by the majority at the outset of its analysis to reaffirm *Zehr*'s finding of error (234 Ill. 2d at 189). There is no recognition by the majority of this inconsistency.

Further, this wholesale rejection of the *Zehr* court's basis for finding error fails on its own terms. The majority concludes that *Zehr* questioning cannot be essential

to obtaining a fair trial because it must be requested by the defendant and the "default position" is for the trial court "to refrain from *Zehr* questioning." 234 Ill. 2d at 200. For this reason, according to the majority, Rule 431(b)(4) questioning is not "indispensable to a fair trial" (234 Ill. 2d at 196), and the denial of that questioning "does not require automatic reversal" (234 Ill. 2d at 200). But if the majority's reasoning is correct, there can be no reversible error based solely on a trial court's erroneous refusal to ask a tendered question. The "default position" described by the majority would exist in every case where a proffered question is refused. Thus, under the majority's reasoning, every case in Illinois and elsewhere that has found reversible error in such a situation is wrongly decided. See generally 6 W. LaFave, J. Israel, N. King & O. Kerr, Criminal Procedure §22.3(a), at 78 n.23 (3d ed. 2007) (collecting cases finding reversible *voir dire* error). That is a dramatic and unwarranted position to take.

More to the point, the majority's "default position" reasoning was expressly rejected in *Zehr*. *Zehr* was in the exact same posture as the version of Rule 431(b) at issue here; the trial court was not required to ask the relevant questions on its own. Nevertheless, despite this "default position," this court held in *Zehr* that the tendered questions were "essential to the qualification of jurors," that they went " 'to the heart of a particular bias or prejudice which would deprive defendant of his right to a fair and impartial jury' (110 Ill. App. 3d 458, 461)," and that "[t]he refusal to ask resulted in prejudicial error which required reversal." *Zehr*, 103 Ill. 2d at 477-78. At no point in its opinion does the majority explain how, under principles of *stare decisis*, questions which were held indispensable in *Zehr*—under the *same* factual situation presented here—are now dispensable, or why instructions and admonitions deemed inadequate in *Zehr* are

now sufficient to assuage the concerns regarding jury bias. This is a serious omission.

The majority's unsupported rejection of *Zehr* also completely eliminates the rationale behind Rule 431(b)(4), for if the admonition and instruction given in this case are sufficient to assuage any concerns regarding juror bias, then there is no need for the questioning required by Rule 431(b)(4) and *Zehr*. Further, the majority's rejection of *Zehr* renders this court's 2007 amendment of Rule 431(b) nonsensical. That amendment removed the phrase "If requested by the defendant" from the rule, thereby imposing a duty on the trial court to question each potential juror on whether he or she understands and accepts the four principles identified in *Zehr*, regardless of a defense request. Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431(b), eff. May 1, 2007; 234 Ill. 2d at 187 n.2. But why impose this burden on the trial courts at all if the questions are not necessary to ensure a fair trial and a proper instruction or admonition will do the job? What is the point? The majority opinion leaves us with a supreme court rule which requires that questions be asked only because the court says so, not because they are actually necessary to receive a fair trial before an impartial jury. Again, this is hardly a sensible result.

Finally, the majority relies on *People v. Rivera*, 227 Ill. 2d 1 (2007) (*Rivera II*), *aff'd*, 556 U.S. 148, 173 L. Ed. 2d 320, 129 S. Ct. 1446 (2009), wherein this court held that a trial court's erroneous denial of a defendant's use of a peremptory challenge is subject to harmless-error analysis.

In *Rivera II*, we specifically stated that we were not addressing challenges "for cause." See *Rivera II*, 227 Ill. 2d at 20 (indicating that defendant Rivera was not arguing that the juror in question "was subject to excusal for cause"). This fact is important. A challenge for cause is a

"challenge supported by a specified reason, such as bias or prejudice, that would disqualify that potential juror." Black's Law Dictionary 245 (8th ed. 2004). In contrast, a peremptory challenge is "[o]ne of a party's limited number of challenges that do not need to be supported by a reason" although the challenge may not be used to discriminate against a protected minority. Black's Law Dictionary 245 (8th ed. 2004). See *Swain v. Alabama*, 380 U.S. 202, 220, 13 L. Ed. 2d 759, 772, 85 S. Ct. 824, 836 (1964), *rev'd on other grounds*, *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986); *Hayes v. Missouri*, 120 U.S. 68, 70, 30 L. Ed. 578, 580 (1887). Put simply, challenges for cause are of constitutional dimension because they eliminate persons who would be unable, due to their bias or prejudice, to afford a defendant his constitutional right to a fair trial. Peremptory challenges, on the other hand, are not of "constitutional dimension." *Ross v. Oklahoma*, 487 U.S. 81, 88, 101 L. Ed. 2d 80, 90, 108 S. Ct. 2273, 2278 (1988). See also *Rivera*, 556 U.S. at 158, 173 L. Ed. 2d at 329, 129 S. Ct. at 1454 (stating that peremptory challenges are "state-provided" rights, and that errors of state law do not automatically equate to a federal constitutional violation). The type of bias which might prompt a defendant's exercise of a peremptory challenge would not necessarily render that person unqualified to be a juror. Moreover, because peremptory challenges are not of constitutional dimension, a state could, if it so chose, eliminate peremptory challenges without violating any federal constitutional principle. However, a state may not take away a defendant's right to challenge a juror for cause based on a bias against a defendant's right not to testify. *Cf. Carter v. Kentucky*, 450 U.S. 288, 305, 67 L. Ed. 2d 241, 254, 101 S. Ct. 1112, 1121-22 (1981) ("a state trial judge has the constitutional obligation, upon proper request, to

minimize the danger that the jury will give evidentiary weight to a defendant's failure to testify").

The majority's reliance on *Rivera II* for applying harmless error in this case is understandable in light of the majority's conclusion that Rule 431(b)(4) questioning is not necessary for a fair trial. In the view of the majority, Rule 431(b)(4) questions are the functional equivalent of the peremptory challenges addressed in *Rivera II*. But that is not what *Zehr* held. *Rivera II* is completely irrelevant to the threshold question in this case, *i.e.*, whether *Zehr*'s holding that the relevant questions are essential to obtaining an impartial tribunal should be overturned in the first place. Moreover, as noted, the majority has not even acknowledged, let alone justified, its departure from *Zehr* under principles of *stare decisis*.

In sum, the majority opinion can be read in two ways. On the one hand, the majority may intend to reaffirm *Zehr*'s holding that the relevant questions are essential to obtaining a fair trial. If that is the case, then the majority's adoption of harmless-error analysis is unwarranted because, as *Zehr* recognizes, the absence of something essential to a fair trial cannot be harmless. On the other hand, the majority may intend to overrule *Zehr*'s holding that the questions are essential. But if that is the case, the majority has failed to provide any justification under principles of *stare decisis* for reaching that result. Regardless of which meaning is intended by the majority, either result is unsound. I would adhere to the straightforward application of *Zehr* and Rule 431(b)(4) and reverse defendant's conviction.

For the foregoing reasons, I respectfully dissent.

JUSTICE FREEMAN joins in this dissent.