2021 IL App (1st) 181265-U
No. 1-18-1265
Order filed March 22, 2021

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 23520 |
| | ) | |
| DERRICK WILLIAMS, | ) | Honorable |
| | ) | Thomas V. Gainer, Jr., |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court.
Presiding Justice Walker and Justice Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The judgment of the circuit court is affirmed where the defendant failed to preserve the issue for appeal and no clear or obvious error occurred, as the State's remarks in closing argument neither improperly bolstered the credibility of the State's witnesses nor referred to facts not entered into evidence, and the State's remarks in rebuttal were invited by defense counsel.

¶ 2    A jury convicted Derrick Williams of first degree murder and attempt robbery. On appeal, he alleges the trial was unfair because in closing argument the State referred to facts not in evidence and improperly bolstered a State witness's credibility.

¶ 3     We affirm, finding the States' remarks in closing arguments proper and they do not constitute a clear or obvious error that warrants plain error review.

¶ 4                              Background

¶ 5     By indictment, Derrick Williams was charged with 24 counts of first degree murder, 3 counts of attempt armed robbery, 1 count of attempt robbery, and 1 count of aggravated unlawful restraint in the murder of Michael Sullivan. Codefendant Rayshon Williams was included in multiple counts of the indictment. (We refer to defendant Derrick Williams as "Williams" and codefendant Rayshon Williams, who has the same last name, by his first name, "Rayshon.") Rayshon entered into a plea agreement under which he agreed to testify against Williams at trial. In exchange, the State agreed to amend one of the first degree murder counts against Rayshon to allege conspiracy to commit first degree murder and dismiss all other counts against Rayshon. The State also agreed to recommend that Rayshon receive a sentence of 15 years' imprisonment.

¶ 6     The State proceeded to trial against Williams on three counts of first degree murder (720 ILCS 5/9-1(a)(1), (2), (3) (West 2012)) and one count of attempt robbery (720 ILCS 5/8-4, 18 1(a) (West 2012)).

¶ 7     At trial, Rayshon testified that on November 12, 2013, he woke up at Williams's house with Jasmine Johnson, another woman, and Williams, whom he identified in court. That night, Rayshon and Williams took Williams's purple Hyundai to rob someone. They drove on Kildare Avenue near Maypole Avenue and Kildare Avenue and saw an "elder man," whom he identified as the victim, walking on Kildare. Williams honked the Hyundai's horn, laughed, and said that he found a "lick," which was an "easy way to get some money."

¶ 8     Rayshon got out of the Hyundai and tried to grab Sullivan's arm. Sullivan swung at Rayshon, and Rayshon ran back inside the Hyundai. Williams then drove towards Sullivan, who

attempted to walk away in the other direction. Williams parked and with a silver revolver, approached Sullivan. Rayshon heard one gunshot from behind the Hyundai and saw Sullivan fall with his hands raised. Williams and Rayshon spent the rest of the night at Williams's house.

¶ 9     The next day, Williams and Rayshon drove the Hyundai "around" and met with Antwon Bush. Williams spoke with Bush. Williams then entered and operated a "stolen" Nissan while Rayshon parked the Hyundai in an alley between Kildare and Keller. Rayshon joined Williams in the Nissan and gave Williams the Hyundai keys. They picked up Johnson and another woman and drove until police officers stopped them.

¶ 10    The State published excerpts of surveillance footage of Kildare and Lake's intersection on the night of the incident. Rayshon narrated the footage consistently with his testimony regarding the shooting, pointing out the Hyundai, his altercation with Sullivan, Williams's approaching Sullivan, and Sullivan falling to the ground. The State also entered into evidence Williams's phone, Rayshon's phone, the keys to the Hyundai, and photographs of the Hyundai, the alley in which it was parked, Rayshon's sweatshirt found in the Hyundai's backseat, and Williams's "USA" jacket which Rayshon had identified Williams wearing in the video.

¶ 11    On cross-examination, Rayshon confirmed police arrested him. He confirmed that he "minimized" to police how well he knew Williams initially saying he dropped Williams off at his aunt's house after the shooting and he did not know where Williams's Hyundai was parked. Rayshon lied because he was "scared."

¶ 12    Chicago police officer Jessie Rodriguez testified that she and her partner arrived after the shooting. Sullivan was pronounced dead at the scene. A Cook County chief medical examiner testified that Sullivan's cause of death was a gunshot wound to his face; his manner of death was

homicide. Sullivan's daughter, Latice Sullivan-O'Connor, testified Sullivan was 53 years old when he died, had worked for UPS for 32 years, and worked a midnight shift as a loader.

¶ 13    Elgin White testified that he lived on the second floor of a two-flat building on Lake with family members. His living room at the front of the apartment had a window facing Lake. At about 11 p.m., he was in the apartment and heard a gunshot from a close distance. White ran to the front room and looked out the window. He saw Williams, whom he identified in court, enter a dark-colored, four-door car parked across the street and drive away slowly. White denied that anything obstructed his view of Williams's face as Williams sat inside the car, as its front driver's side window was down. White later saw police vehicles and ambulances arrive, went outside, and saw a body across the street. White told police what he had seen.

¶ 14    On November 15, White went to a police station, identified Williams from a physical lineup, and identified a photograph of the car Williams drove on the night of the shooting. The State entered multiple photographs of the lineup into evidence. White circled or pointed to Williams in each photograph. White also confirmed that multiple photographs depicted Williams, the car, and the location where White saw Williams enter the car.

¶15    On cross-examination, White acknowledged he did not see Williams with a firearm but stated that Williams was the only person he saw outside after the gunshot. Defense counsel said it wanted to discuss the number of times White had seen Williams's "picture." White then confirmed that, at the police station, he viewed a physical lineup and then photographs of Williams. White later gave a videotaped statement to an assistant state's attorney and was shown the same photographs of Williams. White also saw these photographs before the grand jury. On redirect examination, White confirmed that he told the detectives, the assistant state's attorney, and the grand jury that he saw Williams enter the car after the gunshot and drive away.

¶ 16    Antwon Bush testified that in 2013, Bush saw Williams once or twice a week. He identified Williams in court. On November 13, Bush did not remember meeting with Williams and Rayshon, but did see Williams driving a purple car. A detective arrested Bush one day while he was walking home, but Bush could not recall the date. Bush also did not recall speaking with a detective at the police station but stated he told a detective, he talked to Rayshon on November 13. Bush denied telling the detective he "drove around" with Williams and Rayshon that day.

¶ 17    Bush did not remember speaking with an assistant state's attorney but confirmed that an assistant state's attorney wrote out his statement that he signed. Bush could not remember telling the assistant state's attorney about his face-to-face interactions with Williams and Rayshon on November 13. But he confirmed that when he returned home, he texted Rayshon about seeing news that a 54-year-old man was shot on Lake. The State asked Bush questions regarding his grand jury testimony, and Bush responded, "I don't remember," to each question, including who was present at the proceeding, what he was asked, or how he responded.

¶ 18    On cross-examination, Bush confirmed that Rayshon was "a very close friend" and he sometimes saw Rayshon multiple times a day.

¶ 20    Assistant State's Attorney Catherine Malloy testified she handwrote Bush's statement at the police station, and Bush initialed changes and signed the statement. The next day, Malloy presented Bush to the grand jury, where he testified under oath. Malloy read to the jury Bush's handwritten statement and the transcript of Bush's grand jury testimony. The recitations reflected that Bush was friends with Williams and Rayshon. On November 13, 2013, at about 10 a.m., Bush met with Williams and Rayshon inside a "purple-grayish" car. Williams told Bush that Williams tried to rob a man on Lake. When the robbery did not "go right," Williams had to "pop" the victim, meaning "beat" or "shoot" him, and the victim "dropped." Bush never saw Williams and Rayshon

after that day. On television, Bush saw news "[a]bout the old man getting killed" on Lake. He texted Rayshon, " '[t]hat s*** on the news, boy.' "

¶ 21    Jasmine Johnson testified that Williams was her child's father. She rode in Williams's car on November 12, and Williams and Rayshon picked her up in a different car the next day. Jessica McCray, Williams's mother, testified that she gave a statement to an assistant state's attorney. According to the statement, Williams and Rayshon came home on November 13, at 1:30 a.m., and they were gone when McCray woke up.

¶ 22    Chicago police detective Art Taraszkiewicz testified he told detective Greg Swiderek that the surveillance footage of Sullivan's murder showed the shooter wearing a jacket. Swiderek contacted an evidence technician, who recovered and inventoried the "USA" jacket Williams had on when arrested. Swiderek found a Hyundai key among the items that had been inventoried. Taraszkiewicz later learned that a purple Hyundai was reported in an alley.

¶ 23    Taraszkiewicz discovered multiple sources of surveillance footage on the night of the shooting. He narrated excerpts of the footage consistently with the description given by Rayshon. After the arrest of Williams and Rayshon, Taraszkiewicz's partner mirandized Rayshon and Taraszkiewicz spoke with him. Rayshon made admissions and shared information about the incident. Taraszkiewicz prepared a lineup for White and learned that White identified Williams.

¶ 24    On cross-examination, Taraszkiewicz confirmed that a firearm was also not recovered from the Hyundai or Nissan.

¶ 26    The defense called Chicago police forensic investigator Zbigniew Niewdach. On November 14, Niewdach processed the purple Hyundai and lifted fingerprint ridges from the exterior front driver's side door window, exterior front passenger's side door frame, and exterior gas cap door. Illinois State Police forensic scientist Emily Kuppinger compared the fingerprint lifts

with the fingerprints of Rayshon and Williams. She made one match—the print from the gas cap door matched with Rayshon's fingerprint.

¶ 27 Illinois State Police forensic scientist Mary Wong testified that the "USA" jacket recovered from Williams "may not have been in the vicinity of a discharged firearm or came in contact with a primer gunshot residue-related item." Wong stated any particles from a gunshot "were either removed by activity," "not deposited," or "not detected by the procedure." The parties stipulated that, if called to testify, Chicago police detective Matias would state that he executed a search warrant at Williams's house and recovered no firearm.

¶ 28 The jury found Williams guilty of first degree murder and attempt robbery and found Williams proximately caused death to another person by personally discharging a firearm.

¶ 29 Williams filed a posttrial motion, alleging, in part, that remarks in the State's closing argument prejudiced him by (i) improperly arguing he was "staring [Bush] down" while Bush testified, (ii) improperly implying White risked "violent retribution" when he testified, (iii) improperly bolstering White's credibility, and (iv) improperly arguing White would pick Williams out of multiple lineups. The State responded that these claims were forfeited as Williams did not object at trial and, in any event, the remarks were proper.

¶ 30 The trial court denied Williams's motion, finding Williams made no objections regarding the State's closing argument and the State made no improper arguments. The court merged the first degree murder counts, sentencing Williams to 60 years in prison on the count premised on his intentional shooting and killing Sullivan and personal discharge of the firearm that proximately caused death (720 ILCS 5/9-1(a) (West 2012)). It also sentenced Williams to a concurrent five-year prison term for attempt robbery.

¶ 31                                    Analysis

¶ 32　Williams argues that he was denied a fair trial, and plain error occurred, where the State made improper remarks in closing argument by referring to facts not in evidence and bolstering White's credibility. Specifically, Williams argues that the State improperly implied that its witnesses Bush and White feared retribution by Williams, expressed personal opinions of White, and suggested that White identified, or would have identified, Williams from multiple lineups. The State denies that plain error occurred. Namely, the State argues it did not imply in closing that Williams threatened witnesses or White identified Williams in more than one lineup. Nor did not it bolster White's credibility.

¶ 33　Williams failed to preserve the issues, as there was no contemporaneous objection to the State's remarks during trial. See *People v. Wheeler*, 226 Ill. 2d 92, 122 (2007) ("To preserve claimed improper statements during closing argument for review, a defendant must object to the offending statements both at trial and in a written posttrial motion."). Nonetheless, Williams asserts that we may review this claim under the plain error doctrine.

¶ 34　Under plain error, a reviewing court may address a forfeited claim where a "clear or obvious error occurred," and either (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *People v. Reese*, 2017 IL 120011, ¶ 60. As to the first prong, Williams must show the error was prejudicial due to "the fact that it occurred in a close case where its impact on the result was potentially dispositive." *People v. Sebby*, 2017 IL 119445, ¶ 68. As to the second prong, if the defendant meets their burden, "[p]rejudice *** is presumed because of the importance of the right involved." (Internal quotation marks omitted.) *Id.* ¶ 50.

¶ 35    Williams asserts that both prongs of the plain-error doctrine are satisfied. When applying the plain-error doctrine, however, we first determine whether a clear or obvious error occurred. *Reese*, 2017 IL 120011, ¶ 60.

¶ 36    We find no error in the State's closing and rebuttal arguments.

¶ 37    "A prosecutor has wide latitude in making a closing argument and is permitted to comment on the evidence and any fair, reasonable inferences it yields." *People v. Glasper*, 234 Ill. 2d 173, 204 (2009). Prosecutors must argue facts in the record. *People v. Kliner*, 185 Ill. 2d 81, 151 (1998). They cannot vouch for the credibility of a witness or express a personal opinion about the case. *People v. Emerson*, 122 Ill. 2d 411, 434 (1987). But they have considerable latitude in commenting "on the strength of the evidence." *Id.* And statements are proper where "provoked or invited by the defense counsel's argument." *Glasper*, 234 Ill. 2d at 204.

¶ 38    When reviewing a challenge to remarks made in closing argument, "[c]losing arguments must be reviewed in their entirety, and the challenged remarks must be viewed in context." *People v. Caffey*, 205 Ill. 2d 52, 131 (2001). Even where a prosecutorial comment "exceeds the bounds of proper argument," we will not disturb the verdict "unless it can be said that the remark caused substantial prejudice to the defendant," considering "the content and context of the language, its relationship to the evidence, and its effect on the defendant's right to a fair and impartial trial." (Internal quotation marks omitted.) *People v. Williams*, 192 Ill. 2d 548, 573 (2000). Substantial prejudice occurs where "the improper remarks constituted a material factor in a defendant's conviction." (Internal quotation marks omitted.)

¶ 39    The parties dispute the applicable standard for review of challenges to a prosecutor's remarks in closing argument. The State refers to our Supreme Court's recent decision, *People v. Jackson*, 2020 IL 124112, holding the standard resembles that used in deciding whether a

prosecutor committed plain error. ¶ 83 (citing *People v. Runge*, 234 Ill. 2d 68, 142 (2009)) (Case may be reversed "only if the defendant demonstrates that the remarks were improper and that they were so prejudicial that real justice was denied or the verdict resulted from the error.") On the other hand, Williams asserts the court in *Jackson* did not expressly overturn *Wheeler*, which applied a *de novo* standard. *Wheeler*, 226 Ill. 2d at 121. We note that Illinois courts have applied an abuse of discretion standard in reviewing the propriety of remarks in closing argument. *People v. Blue*, 189 Ill. 2d 99, 128, 132 (2000). Regardless, our holding would remain the same under either standard. See *People v. Green*, 2017 IL App (1st) 152513, ¶¶ 78, 81.

¶ 40    Williams first argues the State improperly insinuated, without a basis in evidence, (i) Bush and White were intimidated by Williams, (ii) Bush and White would face retribution by Williams for testifying against him, and (iii) Bush testified untruthfully to avoid retribution.

¶ 41    Although Bush never testified, he was threatened by or afraid of Williams, according to Williams, the State improperly implied in closing that Bush testified untruthfully because he feared retribution from Williams. He cites the State's remarks in closing argument that Bush had a "case of very selective amnesia" at trial but testified under oath before the grand jury, and "that means everything that [Bush] told the Grand Jury two days, three days after the murder when he wasn't staring him down, comes in as if he had the guts to tell you that himself." Williams contends this statement suggests, without an evidentiary basis, that Bush did not have the courage to testify truthfully at trial because Williams was "staring him down." Williams further references the State's remarks in rebuttal that "Antwon Bush did not have the moral fortitude that Elgin White did. He [White] was able to stand up here in court and point to him in open court."

¶ 42    From the first statement, however, who stared down whom is a bit hazy. Even if the statement referred to Williams staring down Bush, the trial evidence showed that Bush had known

Williams for many years and considered Williams to be a friend, supporting a reasonable inference that Bush was reluctant to testify at trial due to friendship. Neither statement intimates Bush feared Williams or had been threatened by him. We find no error.

¶ 43    Concerning White, Williams contends that, although White did not testify he feared or felt threatened by Williams, the State repeatedly implied that White faced violent retribution for his testimony when it argued in rebuttal:

> "Do you think it's easy for a young man [White] on the west side living with his father, stepfather, his daughter, and the police knocked on his door after he went down earlier and said I saw something."

Williams further cites State's argument in rebuttal:

> "[t]he only thing it takes for the triumph of evil is for good people to do nothing. And he [White] did something. And he looked at the lineup *** immediately said, it was No. 3. *** [I]t seems like an easy act but it's not. It's not easy because now he's not in the police station. Now he's not in the grand jury. He's in the open, but he did it."

Additionally, the State asked the jury,

> "What benefit does he [White] have to come in here and say anything except what he remembers, what benefit? I know what detriment he has, but what benefit?" Williams contends these statements imply, without evidence, that Williams threatened White or that White was afraid of Williams and faced some sort of risk by testifying."

¶ 44    Again., we find no error. The State had prefaced these statements by stating:

> "John F. Kennedy said the only thing it takes for evil to triumph in this world is for good people to do nothing, and it was hard not to think of that quote when you saw Elgin White walk through those doors, up that long walk, stand there and raise his right

hand, and dressed to the nines, point*** and [say] that's the guy I saw getting in that

car immediately after the gunshot."

The challenged comments, taken in full, describe the hardship of testifying in general and that there is no benefit to doing so. The State described White as courageous for testifying and did not infer that Williams threatened White, as Williams claims. *People v. Medrano*, 271 Ill. App. 3d 97, 106 (1995) (finding prosecution properly commented in closing that it "took courage" for witnesses "to come forward and relive a terrible moment," and rejecting arguments that comment improperly "implied that the witnesses were afraid of [defendant]").

¶ 45    Williams also contends that the State improperly characterized White in a positive light as "good" and courageous and asserted that White would have identified Williams from multiple lineups. And, without a basis in evidence, that the State improperly suggested White had identified Williams multiple times.

¶ 46    In closing, the State argued that "this was a case of a tale of two cities," and the case highlighted "the good people living in sometimes not so good neighborhoods, people like Michael Sullivan," who "was working hard for his family" at UPS for 32 years. The State then referenced "people like Elgin White," who "was going to college and now is working in a factory *** doing the daily grind just as *** Sullivan was doing." The State discussed the evidence in detail, emphasizing White's identification of Williams, and described how the evidence corroborated Rayshon's account of the shooting and showed Williams committed the offense. It told the jury members they "got to judge the way in which [White] got up there and testified and told you exactly what he saw."

¶ 47    Viewed in context, the State's characterization of White's background in closing was proper, as the State did not directly argue that White's education or employment history made

him credible, stating the jury's role was to determine White's credibility. *People v. Deramus*, 2014 IL App (1st) 130995, ¶ 52 ("This court has expressly reject[ed] the notion that a prosecutor improperly crosses the bounds of asserting his personal views regarding witnesses' credibility *** if the jury has to infer the prosecutor is doing so from his comments." (Emphasis and internal quotation marks omitted.)).

¶ 48     Nor do we find the State improperly vouched for White's credibility, as challenged statements responded to defense counsel's closing argument. After the State's initial closing argument, defense counsel argued extensively on the credibility of the State's witnesses and the theme that "nice guys" such as White "can be wrong." Counsel argued that White was in the police station "for hours" and, although he saw a lineup, police were not really interested in neutral evidence. Otherwise, they would have conducted multiple lineups, including initial lineups with Rayshon and Bush to "rule them out" so that there would be "two negative lineups and then *** a positive lineup." Defense counsel asserted that conducting multiple lineups would have made White's identification more reliable. Defense counsel added that White's in-court identification of Williams was unreliable because, by the time White testified at trial, "he had seen about 20 pictures of [Williams]," "had watched the video," and "had talked to the officers."

¶ 49   So then in rebuttal, the State quoted John F. Kennedy and then said, "it was hard not to think of that quote when you saw Elgin White walk through those doors, up that long walk, stand there and raise his right hand, and dressed to the nines, point*** and [say] that's the guy I saw getting in that car immediately after the gunshot." The State was not improperly bolstering White's credibility. Instead, it responded to defense counsel's attack on White's credibility. *People v. Williams*, 289 Ill. App. 3d 24, 35-37 (1997) (finding prosecution could comment in

rebuttal on its witnesses' credibility, where defense invited comments by challenging witnesses' credibility in closing argument).

¶ 50   Nor did the State improperly suggest that White did or would have identified Williams in multiple lineups by arguing in rebuttal that White had not forgotten Williams's face and "I don't care how many lineups you do. Elgin White is saying every single time that's the guy I saw." Because defense counsel questioned in closing whether a single lineup was sufficient for White to identify reliably Williams, the State properly commented on whether multiple lineups would have affected White's identification. *Glasper*, 234 Ill. 2d at 204 (statements "provoked or invited by the defense counsel's argument" are proper). Further, given this context, the State did not suggest that multiple lineups had been conducted, as Williams claims.

¶ 51   We decline to address either prong of the plain-error doctrine as no error occurred. *People v. Ramsey*, 239 Ill. 2d 342, 442-43 (2010).

¶ 52   Affirmed.