**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 190431-U

Order filed November 19, 2021

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 21st Judicial Circuit, Kankakee County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0431 Circuit No. 16-CF-163 |
| | ) | |
| REX FRANK, | ) ) | Honorable Clark E. Erickson, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE WRIGHT delivered the judgment of the court.
Justices Daugherity and Lytton concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The court did not abuse its discretion by admitting other-crimes evidence at trial. The State did not commit reversible plain error in its rebuttal argument.

¶ 2     Defendant, Rex Frank, appeals his conviction for first degree murder. Defendant argues that the Kankakee County circuit court erred by admitting other-crimes evidence at trial. Defendant also argues that the State committed prosecutorial misconduct during its rebuttal argument. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        On April 15, 2016, defendant was charged with two counts of first degree murder (720

ILCS 5/9-1(a)(1), (a)(2) (West 2016)) for the shooting death of Sarah Washington. The

indictment alleged that on June 26, 2014, defendant shot Sarah about the head with a firearm,

thereby causing her death.

¶ 5        Prior to trial, the State filed a motion *in limine* seeking to admit other-crimes evidence.

On July 13, 2015, defendant pled guilty to first degree murder for the shooting death of Rian

Maiden which occurred on or about July 4, 2014. The motion sought to admit certain details

regarding Maiden's murder because the .380-caliber cartridge cases found next to Maiden's body

matched the cartridge cases found next to Sarah's body. The Illinois State Police crime

laboratory determined that the cartridge cases from both scenes were fired from the same

firearm. The motion argued that the other-crimes evidence should be admissible to prove

defendant's participation in Sarah's death, due to the use of the same firearm in each offense.

The court granted the State's motion, finding that there was a strong connection between the two

crimes and that the probative value of the other-crimes evidence outweighed any prejudicial

effect.

¶ 6        Defense counsel made an oral motion *in limine* to limit the scope of the other-crimes

evidence, arguing that disclosure of defendant's conviction for Maiden's murder should be

barred. Counsel argued that details of Maiden's murder were not relevant and would only

prejudice defendant. The court denied defense counsel's motion, and the case proceeded to a jury

trial.

¶ 7        Kathy Washington, Sarah's mother, testified that on June 26, 2014, she and Sarah ran

errands together before she drove Sarah to her apartment in Kankakee at approximately 11:50

a.m. Kathy returned at 4:30 p.m. to drive Sarah to work. When Sarah did not come outside or answer her cell phone, Kathy went to knock on the apartment door. The door was unlocked, so Kathy entered the apartment. Kathy found Sarah dead on the floor of her bedroom. Kathy called 911.

¶ 8 Sergeant Avery Ivey of the Kankakee Police Department testified that he investigated the scene. Ivey found no evidence of a forced entry into the apartment or a struggle. Ivey also found several $20 bills on the floor and a purse that had not been disturbed. There was also a debit card and cell phone on a dresser.

¶ 9 Forensic pathologist Dr. Valerie Arangelovich testified that she performed Sarah's autopsy. The autopsy revealed that Sarah had two gunshot wounds to her forehead. Arangelovich said Sarah died as a result of multiple gunshot wounds.

¶ 10 Greg Dismuke, Sarah's live-in boyfriend, testified that Sarah brought him breakfast on June 26, 2014. Dismuke ate and went back to sleep. When Dismuke awoke at approximately 10 a.m., Sarah was not in the apartment. Dismuke planned to go to Harvey, Illinois and was waiting for his ride when defendant knocked on the door. Defendant was an acquaintance of Dismuke. Dismuke let defendant into the apartment. Dismuke thought he saw the bulge of a gun in defendant's back pocket. Defendant asked to buy marijuana, but Dismuke told defendant that he did not deal drugs. Defendant asked Dismuke for a gun. Dismuke told defendant that he did not have a gun. Defendant also asked to borrow money, but Dismuke said he did not have any money. Dismuke told defendant that he was getting ready to leave to retrieve iPhones to sell. Defendant left the apartment and Sarah arrived home five minutes later. Dismuke exited the apartment. Dismuke locked the door before he left.

3

¶ 11    While traveling to Harvey, Dismuke received a call from defendant. Defendant wanted to know about the iPhones, and Dismuke told defendant he would talk to him later. After speaking with defendant, Dismuke saw that he had two missed calls and a message from Sarah. The message said to call Sarah as soon as possible. Dismuke called and talked to Sarah.

¶ 12    When Dismuke arrived back in Kankakee at approximately 4 p.m., he received a call from defendant. Defendant told Dismuke that there was caution tape around Dismuke's apartment.

¶ 13    Talitha Bell, Sarah's downstairs neighbor, testified that at approximately 12 p.m. on June 26, 2014, she observed Sarah exit Kathy's car and go upstairs to her apartment. At approximately 1:30 p.m., Bell heard "rumbling" coming from upstairs and then heard a "pop."

¶ 14    Sergeant Randy Hartman of the Kankakee Police Department testified that he assisted in the investigation of Sarah's death. On June 26, 2014, at approximately 7:30 p.m., Hartman conducted a recorded interview with defendant at the Kankakee Police Department. The State played video clips from that interview. In the clips, defendant tells Hartman that he went to Sarah's apartment three times earlier that day. Defendant arrived at approximately 11:45 a.m. and spoke with Dismuke. Sarah was not home. Defendant ran an errand and returned to Sarah's apartment and spoke with Dismuke again. Dismuke told defendant about a cell phone scam he was going to try. Sarah was not at home at this time.

¶ 15    Defendant left the apartment at approximately 12:30 p.m. but returned shortly after to ask Dismuke if defendant could participate in the cell phone scam. At the time, Sarah was home and told defendant that Dismuke had already left. Defendant said that Sarah never opened the door. After leaving the apartment, defendant said that he went home for three to four hours. At approximately 4 p.m., defendant met his girlfriend at a barbershop. Defendant said he did not

4

have anything to do with Sarah's death and agreed to have his hands swabbed for gunshot residue.

¶ 16    The parties stipulated to the admission of the testimony of Robert Berk. Berk would testify that in 2014 he was a forensic scientist at the Illinois State Police crime laboratory. Berk would also testify that the gunshot residue test performed on defendant's hands was negative.

¶ 17    Deja Tanzy testified that she was at Dairy Queen on June 26, 2014, at approximately 2:30 p.m. when she observed defendant drive into the parking lot. Defendant parked and stayed in his car for 30 minutes. The State admitted People's exhibit Nos. 64A through 64I, surveillance photographs that showed defendant's car parked at Dairy Queen at approximately 3 p.m.

¶ 18    Deshyla Williams, defendant's former girlfriend, testified that she was at a barbershop in Kankakee on the afternoon of June 26, 2014, when defendant unexpectedly arrived. Defendant left his car at the barbershop and went with Williams to her mother's house. After leaving her mother's house, Williams drove in the vicinity of Sarah's apartment when defendant said that he noticed a crime scene. Williams testified that she did not see a crime scene. Defendant called Dismuke and told him about the crime scene at Dismuke's apartment.

¶ 19    Kashawna Roberts testified that she spoke on the phone with defendant three times on June 26, 2014. Defendant called Roberts at approximately 4:15 p.m. and told Roberts that there was a crime scene at Dismuke's apartment. Roberts spoke with defendant again at approximately 5:15 p.m. During that conversation, defendant told Roberts that he had been at Dismuke's apartment twice and that Dismuke was present both times. Roberts spoke with defendant a third time approximately five minutes after the second conversation. During that conversation, defendant told Roberts that he had been at Dismuke's apartment three times. The third time

5

defendant went to Dismuke's apartment, Sarah told defendant that Dismuke was not at the apartment.

¶ 20    The parties stipulated to the admission of the testimony of Jeremy Bauer, an expert in the field of historical cell site analysis. Bauer would testify that historical cell site data showed that defendant's phone was not in the vicinity of his residence from 12:45 p.m. to 7 p.m. on June 26, 2014.

¶ 21    Mitchell Ledbetter testified that he loaned defendant his black Taurus .380-caliber handgun in the summer of 2013 because Ledbetter believed defendant needed protection. Ledbetter never saw the handgun again. On July 29, 2014, Ledbetter spoke with defendant on the phone. Defendant told Ledbetter that defendant's car, jewelry, and two or three guns were stolen from him. When defendant said he needed money, Ledbetter offered him a disc jockey (DJ) job on July 4, 2014. Defendant never showed up to the job.

¶ 22    Officer Adam Marcotte testified that he worked for the Kankakee County Sheriff's Department in 2014. Marcotte testified that on June 29, 2014, defendant reported to police that he had been robbed and that the attackers had stolen a black Taurus .380-caliber handgun that belonged to Ledbetter.

¶ 23    Robert Hunton, a firearms identification specialist, testified that he analyzed the two bullets used to kill Sarah. Hunton determined that the bullets were .380-caliber and fired from the same firearm. Hunton also determined that a Taurus handgun was among the brands capable of firing the bullets. Hunton testified that he cleaned the cartridge cases from Maiden's murder because "there was a red, crusty material on the outside." Hunton performed a comparison of the fired .380-caliber cartridge cases that were found next to Sarah's and Maiden's bodies. He determined that all four cartridge cases were fired from a single firearm.

6

¶ 24      On cross-examination, defense counsel asked Hunton why he cleaned the cartridge cases from Maiden's murder "with boiling, soapy water" and "with a 10 percent bleach solution" and why Hunton "rinse[d] them off with alcohol." Hunton stated, "To get rid of any biohazard."

¶ 25      Before the State elicited testimony regarding Maiden's murder, the court instructed the jury that the evidence could only be considered on the issues of defendant's identification, motive, and knowledge.

¶ 26      Detective Joni Hart of the Kankakee County Sheriff's Department testified that on July 5, 2014, she was dispatched to Maiden's residence. After arriving at the scene, Hart saw Maiden deceased on the kitchen floor. The State admitted People's exhibit Nos. 65 through 76, which were photographs of the scene. The photographs depicted the garage entry into Maiden's house and an undamaged doorjamb and door handle. The photographs also depicted Maiden lying on the kitchen floor and two cartridge cases. Hart testified that she spoke with defendant at the scene.

¶ 27      Sergeant Kraig Horstmann of the Kankakee County Sheriff's Department testified that he investigated Maiden's murder. Horstmann interviewed defendant on July 11, 2014. Clips from that interview were played for the jury. Defendant said that he entered Maiden's house through the garage. Maiden caught defendant stealing his wallet. Defendant confessed to shooting Maiden three times with a black Taurus .380-caliber handgun. Defendant said that he obtained the gun from Dismuke. Defendant said that he had possessed the gun for three months prior to shooting Maiden, before throwing it into a dumpster. Defendant also said that he had several guns. Horstmann testified that on July 14, 2014, defendant told him that he did not obtain the gun used to kill Maiden from Dismuke.

¶ 28 The parties stipulated to the admission of the testimony of Dr. Michael Humilier, the forensic pathologist who performed Maiden's autopsy. Humilier would testify that Maiden was shot twice in the head, once in the arm, and once in the knee. Maiden died as a result of multiple gunshot wounds.

¶ 29 Sergeant Steven Hunter of the Kankakee Police Department testified about other interviews the police performed during the investigation into Sarah's death. Hunter testified that Dismuke was a person of interest early in the investigation. Hunter interviewed Dismuke and the recording of that interview was given to the State and to defense counsel. Hunter also testified that cell phone extractions were performed on the phones of Dismuke, defendant, and Sarah.

¶ 30 Alyssa Movern, Sarah's friend, testified that she witnessed Dismuke hit Sarah in 2010. Defense counsel introduced a certified conviction of domestic battery for Dismuke.

¶ 31 In its rebuttal argument, the State argued "If the facts are against you, argue the law. If the law is against you, argue the facts. If they're both against you, just argue. That's what you've been hearing for the last week. Just argument." The State argued:

"[THE STATE]: Remember Ledbetter said, Yeah, I threw him some money. He needed some. No big deal. I told him, if you want to make some more money, come help me do a DJ gig on July 4th. If he'd done that, *** Rian Maiden would still be here, wouldn't he?

[DEFENSE COUNSEL]: Well, I object—

[THE STATE]: In fact, he even says—

[DEFENSE COUNSEL]: I object to that inference about the other murder. That evidence is limited evidence, and they can't argue any inferences about Rian Maiden still being here because that's arguing propensity.

8

[THE STATE]: Judge, I'll withdraw it.

THE COURT: Okay.

[THE STATE]: Even though he—

THE COURT: Objection is—

[THE STATE]:—said he was convicted of it.

THE COURT: Objection is sustained.

[THE STATE]: Like I said, sometimes you just argue. ***

[DEFENSE COUNSEL]: And I object to that. I am not just arguing. I am making a legal objection.

THE COURT: Now, that's—

[THE STATE]: I apologize, Judge.

THE COURT: All right. Jury is to disregard the last comment."

¶ 32    Later, the State argued,

"[Hunton] then takes the shell casings from Rian Maiden's house, crime scene, the ones that were covered in blood. Remember he's asked, [w]ell, why were you washing that red stuff off? Why were you washing them in bleach? Because they're in blood. They're—that's a biohazard. That's why he does that. It's not to remove anything that's not harmful to him."

¶ 33    The jury found defendant guilty of count one, first degree murder, and not guilty of count two, first degree murder. The court sentenced defendant to natural life imprisonment.

¶ 34                                    II. ANALYSIS

¶ 35                              A. Other-Crimes Evidence

¶ 36      Defendant argues that the circuit court erred by admitting evidence of Maiden's murder because it was not relevant to prove identity, and, even if relevant, the evidence was inadmissible because it was substantially more prejudicial than probative.

¶ 37      Other-crimes evidence is inadmissible to show a defendant's propensity to commit the charged crime. *People v. Donoho*, 204 Ill. 2d 159, 170 (2003); Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Such evidence is prohibited to prevent the jury from convicting a defendant because he is "a bad person deserving punishment." *Donoho*, 204 Ill. 2d at 170. However, other-crimes evidence may be admitted "to show *modus operandi*, intent, motive, identity, or absence of mistake with respect to the crime with which the defendant is charged." *People v. Pikes*, 2013 IL 115171, ¶ 11; Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). When such evidence is offered, the other crime must have a threshold similarity to the charged crime. *People v. Bartall*, 98 Ill. 2d 294, 310 (1983). The similarity between the crimes increases the relevance of the other-crimes evidence and ensures that it is not used solely to establish a defendant's criminal propensities. *Id.* Even if other-crimes evidence is relevant, "the evidence should not be admitted if its probative value is substantially outweighed by its prejudicial effect." *Pikes*, 2013 IL 115171, ¶ 11; Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 38      "The admissibility of evidence at trial is a matter within the sound discretion of the trial court, and that court's decision may not be overturned on appeal absent a clear abuse of discretion." *People v. Illgen*, 145 Ill. 2d 353, 364 (1991). "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Hall*, 195 Ill. 2d 1, 20 (2000).

10

¶ 39    Here, the circuit court did not abuse its discretion in admitting evidence of Maiden's murder to prove identity. The use of other-crimes evidence to show identity "links the defendant to the offense at issue through some evidence, typically an object, from the other offense." *People v. Quintero*, 394 Ill. App. 3d 716, 727 (2009). "Other-crimes evidence is admissible to show that a defendant had access to guns similar to the one used in the charged crime." *People v. Coleman*, 158 Ill. 2d 319, 335 (1994). Evidence of a subsequent shooting is relevant and admissible to prove that a defendant committed an earlier shooting. *Id.*

¶ 40    Here, the State presented the evidence surrounding Maiden's murder to identify defendant as the person who killed Sarah. The State's expert, Hunton, testified that the cartridge cases found at both crime scenes were fired from the same gun. Defendant pled guilty to Maiden's murder, and therefore, the evidence of Maiden's shooting links defendant to the shooting of Sarah. The evidence of Maiden's murder was properly introduced to identify defendant as the one who killed Sarah.

¶ 41    The circuit court did not abuse its discretion by finding that the probative value of the other-crimes evidence was not substantially outweighed by its prejudicial effect. The evidence was highly probative due to the significant degree of similarity between the crimes. See *Donoho*, 204 Ill. 2d at 184 ("As factual similarities increase, so does the relevance, or probative value, of the other-crimes evidence."). Both Maiden and Sarah were shot twice in the head, and the evidence established that the cartridge cases found at each scene were fired from the same firearm. In addition, there were no signs of forced entry into either victim's home and Sarah's death occurred only eight days before Maiden's murder.

¶ 42    Furthermore, the court read a limiting instruction that instructed the jury to only consider the other-crimes evidence on the issue of defendant's identification, motive, and knowledge. The

11

prejudicial effect of other-crimes evidence is substantially reduced when the circuit court instructs the jury that the evidence is to be received only for a limited purpose. *Illgen*, 145 Ill. 2d at 376. "The jury is presumed to follow the instructions that the court gives it." *People v. Taylor*, 166 Ill. 2d 414, 438 (1995). Defendant points to no evidence to rebut this presumption, and there is no indication in the record that the jury disregarded the court's limiting instruction. Therefore, the court did not abuse its discretion by admitting the evidence of Maiden's murder.

¶ 43    Alternatively, if this court concludes some amount of other-crimes evidence would have been admissible, then defendant submits that the circuit court abused its discretion by allowing the State to introduce too much other-crimes evidence. We disagree. The other-crimes evidence was very probative circumstantial evidence on the issue of identity and was not excessive.

¶ 44                                B. Prosecutorial Misconduct

¶ 45    Defendant argues that the State committed prosecutorial misconduct during rebuttal argument. Although defense counsel objected to some of the prosecutor's comments at trial, counsel failed to preserve this issue for our review by including it in a posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). However, any issue that has not been properly preserved, such as this issue, may be subject to our review based on the plain error doctrine. Defendant asks that we review this issue under both prongs of the plain error analysis. The first step in the plain error analysis is to determine whether there was a clear or obvious error. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 46    The case law provides that "[a] prosecutor has wide latitude in making a closing argument and is permitted to comment on the evidence and any fair, reasonable inferences it yields." *People v. Glasper*, 234 Ill. 2d 173, 204 (2009). Moreover, rebuttal argument is unique in that the prosecution may also address the weaknesses in defense counsel's closing argument.

12

Statements that are provoked or invited by defense counsel's argument are not improper. *Id.* Nonetheless, any argument that serves no purpose other than but to inflame the passion of the jury constitutes error. *People v. Blue*, 189 Ill. 2d 99, 128 (2000). "Closing arguments must be viewed in their entirety and the allegedly erroneous argument must be viewed contextually." *Id.*

¶ 47　　　　Defendant argues that the following argument made by the prosecutor during rebuttal was irrelevant and served only to "inflame the passions of the jury ***."

> "[Hunton] then takes the shell casings from Rian Maiden's house, crime scene, the ones that were covered in blood. Remember he's asked, [w]ell, why were you washing that red stuff off? Why were you washing them in bleach? Because they're in blood."

¶ 48　　　　The prosecutor's comments were not improper. The record reveals the prosecutor was responding to defense counsel's questioning of Hunton about why the cartridge cases were washed prior to any comparative testing. The cartridge cases from Maiden's murder were relevant to the instant case because they matched the cartridge cases from Sarah's murder and were introduced to prove identity.

¶ 49　　　　Defendant directs our attention to the prosecutor's rebuttal argument that Maiden would still be alive if defendant worked the DJ job on July 4, 2014. This comment was improper and served no purpose other than to inflame the jury. See *id.*

¶ 50　　　　Finally, defendant argues that the prosecutor's comment, "[l]ike I said, sometimes you just argue[,]" improperly denigrated defense counsel. Importantly, the court instructed the jury to disregard this remark and there is no reason to believe the jury did not follow the court's instruction.

13

¶ 51    The first prong of the plain error analysis does not require reversal of the unpreserved error attributable to rebuttal argument because the evidence was not closely balanced. In determining whether the evidence was closely balanced we "must undertake a commonsense analysis of all the evidence in context." *People v. Belknap*, 2014 IL 117094, ¶ 50.

¶ 52    The State's case was based on circumstantial evidence, but circumstantial evidence can be quite compelling when undisputed. For example, Hunton testified that the cartridge cases found next to Sarah's body matched the cartridge cases found next to Maiden's body. It is undisputed that defendant pled guilty to Maiden's murder and admitted to shooting Maiden with a black Taurus .380-caliber handgun. The evidence established that defendant had this same firearm at the time of Sarah's death and that this firearm was capable of firing the bullets that killed Sarah. Although defendant told police that the black Taurus .380-caliber handgun was stolen from him on June 29, 2014, by defendant's own admission, he possessed this same type of gun at the time of Sarah's and Maiden's deaths. Horstmann testified that defendant said that he had possessed the handgun used to kill Maiden three months prior to Maiden's murder on July 4, 2014. Sarah's death occurred only eight days before Maiden's death.

¶ 53    The State also presented evidence that defendant was at Sarah's apartment at or around the time of Sarah's death. In his interview with Hartman, defendant admitted to being at Sarah's apartment three times the day she was killed. The last time defendant was there, sometime after 12:30 p.m., Sarah was alone in the apartment. Defendant said that he never entered the apartment, and he went home for three to four hours. However, defendant's statement about his whereabouts was rebutted by evidence that indicated that defendant lied about his whereabouts around the time of Sarah's death. Tanzy testified that she saw defendant at Dairy Queen at approximately 2:30 p.m., and the historical cell site data showed that defendant's phone was not

14

in the vicinity of his house from 12:45 p.m. to 7 p.m. Therefore, applying a commonsense analysis assessment of the case, we conclude the evidence was not closely balanced.

¶ 54    Turning to the second prong of plain error, structural error, we conclude that the errors were not so serious as to deny defendant a fair trial. "Where the defendant claims second-prong plain error, a reviewing court must decide whether the defendant has shown that the error was so serious it affected the fairness of the trial and challenged the integrity of the judicial process." *People v. Sebby*, 2017 IL 119445, ¶ 50. The supreme court has equated the second prong of plain error with structural error requiring automatic reversal only " 'where an error is deemed "structural," *i.e.*, a systemic error which serves to "erode the integrity of the judicial process and undermine the fairness of the defendant's trial." ' " *People v. Thompson*, 238 Ill. 2d 598, 613-14 (2010) (quoting *Glasper*, 234 Ill. 2d at 197-98, quoting *People v. Herron*, 215 Ill. 2d 167, 186 (2005)). If a defendant shows the error was so serious that it affected the fairness of the trial and challenged the integrity of the judicial process, " '[p]rejudice *** is presumed because of the importance of the right involved.' " *Sebby*, 2017 IL 119445, ¶ 50 (quoting *Herron*, 215 Ill. 2d at 187).

¶ 55    Although we agree with defendant's contention that two of the prosecutor's comments during rebuttal argument were improper, structural error does not exist in this case. First, one error injected into rebuttal argument was cured by the court's instruction to the jury to disregard that portion of the State's rebuttal argument. Thus, any possible prejudice was greatly reduced, if not eliminated, when the court instructed the jury to disregard the comment. See *People v. Johnson*, 208 Ill. 2d 53, 116 (2003).

¶ 56    Next, the prosecutor's second improper comment suggested that Maiden would still be alive had defendant worked the DJ job, while improper, was not part of a pattern of improper

15

argument by this prosecutor. Importantly, defendant has not challenged any portion of the prosecution's initial closing argument. Overall, but for the two erroneous comments discussed above, the prosecutor's closing arguments were fairly based on the evidence and reasonable inferences drawn from that evidence. Therefore, the State's erroneous comments are not reversible plain errors.

¶ 57                                    III. CONCLUSION

¶ 58        The judgment of the circuit court of Kankakee County is affirmed.

¶ 59        Affirmed.